Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa Brown (SBN 301313)
abrown@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER TITTL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,<br><br>Defendants. | Case No. 3:26-cv-01992-AGT<br><br>**PLAINTIFF PETER TITTL'S NOTICE OF FILING OF ADMINISTRATIVE MOTION TO RELATE CASES**<br><br>Judge:    Hon. Alex G. Tse |

**TO ALL PARTIES AND ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on March 12, 2026, Plaintiff Peter Tittl filed an Administrative Motion pursuant to Civ. L.R. 3-12 to relate the instant action to *Bartone v. Meta Platforms, Inc. et al.*, No. 3:26-cv-01897-EMC (ECF 17), the lowest-numbered action. A copy of the Administrative Motion to Relate and supporting documents are attached hereto as **Exhibit A**.

Dated: March 12, 2026                             Respectfully submitted,

                                                  */s/ Tina Wolfson*
                                                  Tina Wolfson (SBN 174806)
                                                  twolfson@ahdootwolfson.com
                                                  Robert Ahdoot (SBN 172098)
                                                  rahdoot@ahdootwolfson.com
                                                  Theodore W. Maya (SBN 223242)
                                                  tmaya@ahdootwolfson.com
                                                  Alyssa D. Brown (SBN 301313)
                                                  abrown@ahdootwolfson.com
                                                  **AHDOOT & WOLFSON, PC**
                                                  2600 W. Olive Avenue, Suite 500
                                                  Burbank, CA 91505-4521
                                                  Telephone:  310.474.9111
                                                  Facsimile:  310.474.8585

                                                  Bradley K. King (SBN 274399)
                                                  bking@ahdootwolfson.com
                                                  **AHDOOT & WOLFSON, PC**
                                                  521 Fifth Avenue, 17th Floor
                                                  New York, NY 10175
                                                  Telephone:  917.336.0171
                                                  Facsimile:  917.336.0177

                                                  *Counsel for Plaintiff and the Proposed Class*

PLAINTIFF PETER TITTL'S NOTICE OF FILING ADMINISTRATIVE MOTION
TO RELATE CASES; No. 26-cv-01992-AGT

# EXHIBIT A

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa Brown (SBN 301313)
abrown@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| GINA BARTONE and MATEO CANU, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,<br><br>    Defendants. | Case No. 3:26-cv-01897-EMC<br><br>**PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIV. L. R. 3-12 AND 7-11**<br><br>Judge: Hon. Edward M. Chen |
| PETER TITTL, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,<br><br>    Defendants. | Case No. 3:26-cv-01992-AGT<br><br>Judge: Hon. Alex G. Tse |

---

NICOLAS TEJADA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 4:26-cv-02015-HSG

Judge:    Hon. Haywood S. Gilliam, Jr.

ARSHAM KOSARI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 3:26-cv-02022-SK

Judge:    Hon. Sallie Kim

PETER CANADY, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 3:26-cv-02118-TSH

Judge:    Hon. Thomas S. Hixson

PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED; No. 3:26-cv-01897-EMC

**TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Pursuant to Rule 3-12 and Rule 7-11 of the Civil Local Rules, Plaintiff Peter Tittl ("Plaintiff Tittl"), the named Plaintiff in *Tittl v. Meta Platforms, Inc. et al.*, No. 3:26-cv-01992-AGT (N.D. Cal.), moves the Court to consider whether the cases should be related as follows:

**I.      THE TITLE AND CASE NUMBER OF EACH PROPOSED RELATED CASE**

On March 4, 2026, Plaintiff Gina Bartone filed the instant action captioned *Bartone v. Meta Platforms, Inc. et al.*, No. 3:26-cv-01897-EMC ("*Bartone*").

On March 8, 2026, Plaintiff Peter Tittl filed his complaint captioned *Tittl v. Meta Platforms, Inc. et al.*, 3:26-cv-01992-AGT ("*Tittl*").

On March 9, 2026, Plaintiff Nicolas Tejada filed his complaint captioned *Tejada v. Meta Platforms, Inc. et al.*, 4:26-cv-02015-HSG ("*Tejada*").

On March 9, 2026, Plaintiff Arsham Kosari filed his complaint captioned *Kosari v. Meta Platforms, Inc. et al.*, 3:26-cv-02022-SK ("*Kosari*").

On March 11, 2026, Plaintiff Peter Canady filed his complaint captioned *Canady v. Meta Platforms, Inc. et al.*, 3:26-cv-02118-TSH ("*Canady*").

Plaintiff Tittl now moves the Court to consider whether the *Bartone, Tittl, Tejada, Kosari,* and *Canady* matters (the "Proposed Related Actions") should be related pursuant to Civil Local Rules 3-12 and 7-11. The operative Complaints for each of the *Tittl, Tejada, Kosari,* and *Canady* actions are attached as Exhibits 1-4 to the Declaration of Tina Wolfson, filed concurrently herewith.

**II.     BRIEF STATEMENT OF THE RELATIONSHIP OF THE ACTIONS**

Civil Local Rule 3-12(a) provides for actions to be related when: "(1) [t]he actions concern substantially the same parties, property, transaction or event; and (2) [i]t appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different [j]udges."

The *Bartone, Tittl, Tejada, Kosari,* and *Canady* actions should be related because the Proposed Related Actions: (a) assert the same claims against the same or similar Defendants; (b) arise from the same underlying event, i.e., Meta Platforms Inc. and Luxottica's ("Defendants") alleged collection, cataloging and storage of Plaintiffs' personal video footage taken using Meta AI Glasses which

1

PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER
CASES SHOULD BE RELATED; No. 3:26-cv-01897-EMC

Defendants developed, advertised and sold; and (c) will result in duplicative motions and discovery if they proceed separately because the complaints raise the same questions of fact and law. The Proposed Related Actions are in the earliest stages, and no rulings have yet been made. The Proposed Related Actions assert that Defendants violated Plaintiffs' and Class Members' reasonable expectation of privacy protected by the California Invasion of Privacy Act (Cal. Penal Code §§ 630 *et seq*., the California Computer Data Access and Fraud Act (Cal. Penal Code § 502), and the Stored Communications Act (18 U.S.C. §§ 2701 *et seq*.) due to Defendants' failure to disclose to consumers that footage from the Meta AI Glasses was viewed and catalogued by overseas workers. All actions assert the same or substantially identical factual allegations against the Defendants and seek the same relief including damages, injunctive and declaratory relief, punitive damages, interest, and attorneys' fees and costs.

Thus, both criteria of Civ. L.R. 3-12(a) are satisfied such that relation before a single judge will conserve the parties' resources and judicial resources, and will avoid "unduly burdensome duplication of labor and expense or conflicting results." Civ. L.R. 3-12(a)(2).

## III.    CONCLUSION

In light of the nearly identical facts and claims alleged in each Plaintiffs' respective complaints the Proposed Related Actions should be related and assigned to this Court.

Dated: March 12, 2026                     Respectfully submitted,

                                          /s/ Tina Wolfson
                                          Tina Wolfson (SBN 174806)
                                          twolfson@ahdootwolfson.com
                                          Robert Ahdoot (SBN 172098)
                                          rahdoot@ahdootwolfson.com
                                          Theodore W. Maya (SBN 223242)
                                          tmaya@ahdootwolfson.com
                                          Alyssa D. Brown (SBN 301313)
                                          abrown@ahdootwolfson.com
                                          **AHDOOT & WOLFSON, PC**
                                          2600 W. Olive Avenue, Suite 500
                                          Burbank, CA 91505-4521
                                          Telephone:  310.474.9111
                                          Facsimile:   310.474.8585

2

PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED; No. 3:26-cv-01897-EMC

Bradley K. King (SBN 274399)
bking@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone:  917.336.0171
Facsimile:  917.336.0177

*Counsel for Plaintiff and the Proposed Class*

3

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa Brown (SBN 301313)
abrown@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| GINA BARTONE and MATEO CANU, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,<br><br>Defendants. | Case No. 3:26-cv-01897-EMC<br><br>**DECLARATION OF TINA WOLFSON IN SUPPORT OF PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIV. L. R. 3-12 AND 7-11**<br><br>Judge:   Hon. Edward M. Chen |
| PETER TITTL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,<br><br>Defendants. | Case No. 3:26-cv-01992-AGT<br><br>Judge:      Hon. Alex G. Tse |

DECLARATION OF TINA WOLFSON IN SUPPORT OF PLAINTIFF PETER TITTL'S
ADMINISTRATIVE MOTION TO RELATE CASES; No. 3:26-cv-01897-EMC

NICOLAS TEJADA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 4:26-cv-02015-HSG

Judge:     Hon. Haywood S. Gilliam, Jr.

ARSHAM KOSARI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 3:26-cv-02022-SK

Judge:     Hon. Sallie Kim

PETER CANADY, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 3:26-cv-02118-TSH

Judge:     Hon. Thomas S. Hixson

DECLARATION OF TINA WOLFSON IN SUPPORT OF PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO RELATE CASES; No. 3:26-cv-01897-EMC

I, Tina Wolfson, declare as follows:

1. I am an attorney licensed, authorized, and admitted to practice law before this Court and the federal and state courts of the State of California. I am a partner at the law firm of Ahdoot & Wolfson, PC and counsel of record for Plaintiff Peter Tittl ("Plaintiff Tittl") in the action *Tittl v. Meta Platforms, Inc. et al.*, No. 3:26-cv-01992-AGT ("*Tittl*") and in that capacity hereby make this declaration.

2. On March 4, 2026, Plaintiff Gina Bartone filed the instant action captioned *Bartone v. Meta Platforms, Inc. et al.*, ("*Bartone*") No. 3:26-cv-01897-EMC. (ECF 1).

3. On March 8, 2026, Plaintiff Peter Tittl filed his complaint captioned *Tittl v. Meta Platforms, Inc. et al.*, 3:26-cv-01992-AGT ("*Tittl*"). The operative complaint for *Tittl* is attached as **Exhibit 1**.

4. On March 9, 2026, Plaintiff Nicolas Tejada filed his complaint captioned *Tejada v. Meta Platforms, Inc. et al.*, 4:26-cv-02015-HSG ("*Tejada*"). The operative complaint for *Tejada* is attached as **Exhibit 2**.

5. On March 9, 2026, Plaintiff Arsham Kosari filed his complaint captioned *Kosari v. Meta Platforms, Inc. et al.*, 3:26-cv-02022-SK ("*Kosari*"). The operative complaint for *Kosari* is attached as **Exhibit 3**.

6. On March 11, 2026, Plaintiff Peter Canady filed his complaint captioned *Canady v. Meta Platforms, Inc. et al.*, 3:26-cv-02118-TSH ("*Canady*"). The operative complaint for *Canady* is attached as **Exhibit 4**.

7. The *Bartone, Tittl, Tejada, Kosari and Canady* actions are in the early stages of litigation. No substantive rulings have been made in any of the actions to date.

8. Pursuant to Civil Local Rule 3-12(b), a copy of this motion, together with proof of service, has been served on all known parties in each of the actions listed above that Plaintiff *Tittl* seeks to relate.

1

DECLARATION OF TINA WOLFSON IN SUPPORT OF PLAINTIFF PETER TITTL'S
ADMINISTRATIVE MOTION TO RELATE CASES; No. 3:26-cv-01897-EMC

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed on March 12, 2026.


        */s/ Tina Wolfson*
        Tina Wolfson

DECLARATION OF TINA WOLFSON IN SUPPORT OF PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO RELATE CASES; No. 3:26-cv-01897-EMC

# EXHIBIT 1

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa Brown (SBN 301313)
abrown@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER TITTL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA INC.,<br><br>Defendants. | Case No. 26-cv-1992<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiff Peter Tittl ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), by and through his undersigned counsel, brings this class action complaint against Defendants Meta Platforms, Inc. ("Meta") and Luxottica of America Inc. ("Luxottica" and, collectively with Meta, "Defendants").

## I.   INTRODUCTION

1.   Defendants developed, advertised, and sold "smart" glasses integrated with cameras and artificial intelligence software. Defendants advertise their Meta AI Glasses, sold under popular brands such as Ray-Ban and Oakley, as "designed for privacy, controlled by you" and "built for your privacy." However, Defendants fail to disclose to American consumers that footage from Meta AI Glasses is viewed and catalogued by overseas workers in a startling invasion of personal privacy.

2.   Users never give Defendants informed consent to track and store the camera footage on their Meta AI Glasses. Nevertheless, Defendants do just that, using the integrated AI cameras to access and exploit the recordings of users' private lives, including footage taken without their knowledge and consent from inside their homes and of their families.

3.   Defendants' deceptive and outrageous conduct violates its users' reasonable expectations of privacy. The intent and efforts of individuals to safeguard their private information and communications must be respected. The ramifications of unauthorized access to this private video footage can be severe, and individuals accordingly go to great lengths to safeguard the privacy of their homes, and, in the case of parents and guardians, also that of their minor children.

4.   While falsely characterizing their illusory privacy safeguards, Defendants deceptively and unconscionably deprived and continues to deprive Plaintiff and Class Members of their privacy rights in the footage captured by Meta AI Glasses. This is true not only for Plaintiff and Class Members, but also for their children, whose privacy they also sought to protect.

5.   Defendants' conduct violates the California Invasion of Privacy Act (Cal. Pen. Code §§ 630, et seq. ("CIPA")), the California Computer Data Access and Fraud Act (Cal. Pen. Code § 502 ("CDAFA")), the Stored Communications Act (18 U.S.C. § 2701, et seq. ("SCA")), the California Consumers Legal Remedies Act (Cal. Civ. Code § 1750, et seq. ("CLRA")), the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, et seq. ("UCL")), the California False Advertising

1

CLASS ACTION COMPLAINT

Law (Cal. Bus. & Prof. Code § 17500, et seq. ("FAL")), and California's Constitutional Right to Privacy, and it constitutes an unlawful intrusion upon seclusion, a breach of contract, and unjust enrichment.

## II.    THE PARTIES

6.    Plaintiff Peter Tittl is a California citizen who resides in Orange County, California. Plaintiff obtained Meta AI Glasses for personal use and relied on Defendants' advertisements that his privacy would be protected and that the footage recorded by the AI glasses would be protected and remain private. Plaintiff values his privacy—and the privacy of his family and friends—in the use of Meta AI Glasses and reasonably expected the footage recorded on them to remain private. Despite this reasonable expectation, Defendants surreptitiously recorded, viewed, and catalogued video footage from Plaintiff's Meta AI Glasses without his knowledge or consent to track Plaintiff's activities and private life. Throughout the relevant time period, Plaintiff used his Meta AI Glasses throughout the day, unaware that Defendants were tracking and monitoring the private footage captured. In the interest of protecting his privacy and security, Plaintiff does not recite here the precise activities that his Meta AI Glasses captured during the relevant time, but he does allege that the following could be determined from that footage: financial information, employment information, religious affiliations and activities, political affiliations and activities, medical care, the identities of his family, friends, and other contacts, social habits and activities, eating habits, shopping habits, and exercise habits.

7.    Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business located in Menlo Park, California. On information and belief, Meta, in partnership with Luxottica, advertises, markets, and sells the Meta AI Glasses throughout the United States. Meta is a sophisticated applications developer in the business of commercializing personal data extracted from the use of tools and services connected to the internet. As such, Meta is aware of and benefits from the conduct described herein.

8.    Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business located in Mason, Ohio. On information and belief, Luxottica, in partnership with Meta, advertises, markets, and sells the Meta AI Glasses throughout the United States. The conduct described herein was authorized, ratified, and/or approved by Luxottica and its agents, and the advertisements for

2

and promotion of Meta AI Glasses were disseminated throughout California and the nation by Luxottica and its agents to deceive and mislead consumers into purchasing the Meta AI Glasses.

**III.   JURISDICTION AND VENUE**

9.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some Members of the proposed Class are citizens of a state different from one or more Defendants.

10.   This Court has personal jurisdiction over Meta because Meta owns and operates a business that is headquartered in this District, and both Defendants conduct substantial business in this District and throughout California and expressly avail themselves of the laws of California.

11.   Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(1), as Meta is headquartered in this District and the conduct described herein giving rise to Plaintiff's and Class Members' claims arose and emanated from within this District.

**IV.   STATEMENT OF FACTS**

12.   Defendants have and continue to advertise Meta AI Glasses as being rooted in privacy and control for the consumer over the video and audio footage the glasses capture. Defendants dedicate an entire website to the privacy features of Meta AI Glasses, including prominent slogans touting user control over their privacy, such as:

- "Designed for privacy, controlled by you";
- "You're in control of your data and content";
- "giving you control over what content you choose to share with others";
- "Privacy Settings that matter"; and
- "Built for your privacy and others' too"[1]

13.   Defendants prominently promote the privacy and control associated with user's experience with Meta AI Glasses, indicating "You're in control of your experience."[2]

---

[1] https://www.meta.com/ai-glasses/privacy/.

[2] https://www.meta.com/ai-glasses/oakley-meta/.

CLASS ACTION COMPLAINT

14.     However, despite these prominent advertising promises, Meta AI Glasses capture and store footage and certain AI features are required to remain "always on."[3]

15.     In addition to not being able to turn off certain tracking features despite Defendants' privacy promises, Defendants also are sharing data from Meta AI Glasses with third-party contractors, including private, sensitive video footage. In particular, it has been reported that employees of Sama, a Meta subcontractor, are fed this sensitive user data by Meta to track, view, and catalogue user activity. What has resulted are reports by those employees of highly sensitive and private video clips being viewed by them, including sexual activity, bathroom footage, and banking information.[4]

16.     The data—including sensitive video footage—captured by Meta AI Glasses and shared and viewed without user knowledge or informed consent is extremely valuable to Defendants, who utilize it to train and improve their AI models, and to profile their customers for targeted advertising.

17.     Although reports to date have focused on Meta's usage of this material to train and improve its AI, the footage enables no doubt bolsters Meta's massively lucrative advertising business by allowing Defendants to cross-reference and conduct unlimited analysis toward unmerited, improper, and monetizable insights into users' private lives, including their social, professional, and other relationships.

18.     The collection and use of users' private footage violates users' reasonable expectations of privacy, and also puts them at increased risk for further privacy violations. Data breaches and other security vulnerabilities are increasingly common among companies that store user data. As a major aggregator of valuable personally identifying and other information, Meta is an obvious target for hackers. Any information that Meta stores from the AI Glasses' recordings may eventually be stolen, if it has not already been.

---

[3] *Meta's Controversial Data Policy on Ray-Ban Smart Glasses Sparks Privacy Debate*, OPENTOOLS, May 1, 2025, https://opentools.ai/news/metas-controversial-data-policy-on-ray-ban-smart-glasses-sparks-privacy-debate#section0.

[4] *She Came Out of the Bathroom Naked, Employee Says*, SVENSKA DAGBLADET, Feb. 27, 2026, https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything.

CLASS ACTION COMPLAINT

19. Each of the following acts defy social norms and invade reasonable privacy expectations: tracking private video footage contrary to users' consent, misleading users regarding whether the AI Glasses' footage will remain private, and failing to disclose how AI was monitoring, tracking, and utilizing this private footage. Normally, mobile device and Internet users such as Plaintiff are able to affirmatively control the flow of sensitive information about themselves through "settings" and "permissions" that they grant, or withhold, from third parties, particularly private parties such as Defendants. Plaintiff's and Class Members' expectations that those settings and permissions would be heeded and effective, and that they could use Meta AI Glasses privately without being tracked by Defendants, are eminently reasonable.

20. Plaintiff and Class Members took specific steps to protect their private lives (as well as the privacy of their minor children) and had a reasonable expectation that Defendants would not use AI to monitor and track their private lives through video without their informed consent. Based on Defendants' representations and omissions, context, and industry norms, they expected Defendants to heed and follow their instructions and, as a result, expected that their private video footage would be private, not tracked and utilized by Meta's AI tool for Defendants' own benefit and to the detriment of their personal privacy. Those reasonable expectations were consistent with sentiments that are widely shared in American society and elsewhere, and grounded in long-standing social norms and jurisprudence protecting privacy.

21. Invasion of privacy has been recognized as a common law tort for more than a century. In Griswold v. Connecticut, 381 U.S. 479 (1965), the Supreme Court confirmed the primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right of privacy older than the Bill of Rights." For its part, California amended its constitution in 1972 to specifically enumerate a right to privacy in its very first section. See Cal. Const. Art. I, § 1.

22. Meta itself has long acknowledged the importance of user control over privacy settings, and indeed acknowledged as much in the privacy-focused advertising for the Meta AI Glasses.

23. According to a poll by the Pew Research Center, 93% of adults believe that being in control of who can get information about them is important, and 90% believe that controlling what

information is collected about them is important.[5] Additionally, Americans say they do not approve of observation without consent: 88% say it is important that they not have someone watch or listen to them without their permission.[6]

24.     Not only were Defendants' representations about privacy likely to deceive people, Defendants did in fact deceive the millions of people who use Meta AI Glasses. Ordinary users, including Plaintiff, reasonably expected that their video footage captured by Meta AI Glasses would not be tracked, viewed, and catalogued—not only by AI, but by actual human workers of Defendants overseas—unless they affirmatively consented to such tracking.

25.     Defendants misrepresentations continue, despite public reporting. The result is that American consumers continue to be deceived by Defendants into purchasing Meta AI Glasses with the mistaken belief that they have control over the data Meta AI Glasses collect and that their privacy is being protected when they use Meta AI Glasses, when in fact their privacy is being violated and they do not have control over how Defendants use and share their sensitive data.

## V.     CLASS ALLEGATIONS

26.     Plaintiff brings this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class, which is referred to throughout this Complaint as the "Class":

> **All natural persons residing in the United States who purchased and used Meta AI Glasses from Defendants.**

27.     Excluded from each Class are the following individuals: officers and directors of Defendants and their parents, subsidiaries, affiliates, any entity in which Defendants have a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

---

[5] Mary Madden and Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance,* PEW RESEARCH CENTER (May 20, 2015), *available at* https://www.pewresearch.org/internet/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/.

[6] *Id.*

6

28.     Plaintiff reserves the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

29.     This action readily satisfies the requirements set forth under Federal Rule of Civil Procedure 23:

a.     Each Class is so numerous that joinder of all Members is impracticable.  Upon information and belief, Class Members number in the thousands.

b.     There are questions of law or fact common to the Class. These questions include, but are not limited to, the following:

i.     Whether Defendants' acts and practices complained of herein amount to the use of "an electronic amplifying or recording device to eavesdrop upon or record" confidential communications in violation of CIPA;

ii.     Whether Defendants' acts and practices complained of herein amount to "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems" in violation of CDAFA;

iii.     Whether Defendants' acts and practices complained of herein amount to "intentionally accesses without authorization a facility through which an electronic communication service is provided" in violation of the SCA;

iv.     Whether Defendants' acts and practices complained of herein amount to unlawful, unfair, and/or fraudulent practices in violation of the UCL;

v.     Whether Defendants' acts and practices complained of herein amount to false advertising in violation of the FAL;

vi.     Whether Defendants' acts and practices complained of herein amount to misleading conduct in violation of the CLRA;

vii.     Whether Defendants' acts and practices complained of herein amount to a breach of contract;

viii.     Whether Defendants' acts and practices complained of herein amount to egregious breaches of social norms;

---

7

CLASS ACTION COMPLAINT

  ix. Whether Defendants' acted intentionally in violating Plaintiff's and Class Members' privacy rights;

  x. Whether Defendants were unjustly enriched;

  xi. Whether an injunction should issue; and

  xii. Whether declaratory relief should be granted.

c. Plaintiff's claims are typical of the claims of the Class. Plaintiff and Class Members purchased and used Meta AI Glasses that they recorded video footage they thought was private and not being tracked, viewed, and catalogued by Defendants. Despite these efforts and contrary to Defendants' representations, Plaintiff and Class Members nonetheless had their private video footage tracked, viewed, and catalogued by Defendants. Plaintiff and Class Members did not consent to Defendants tracking of their private videos, which forms the basis for this suit.

d. Moreover, like all Class Members, Plaintiff suffered a substantial risk of repeated injury in the future. Defendants have shown deliberate indifference to Plaintiff's and Class Members' desire to keep their video footage private, and has indeed taken pains to deceive and mislead Plaintiff (and all Class Members) and to conduct its business contrary to their privacy rights, and contrary to the plain meaning of its own terms of service in favor of surreptitiously and deceitfully monitoring their private communications. Defendants' deceptive and deliberate actions have thwarted and continue to threaten Plaintiff's (and Class Members') ability to exercise control over their own privacy while using Meta AI Glasses. Because the conduct complained of herein is systemic, Plaintiff and Class Members face substantial risk of the same injury in the future. Defendants' conduct is common to all Class Members and represents a common pattern of conduct resulting in injury to all Class Members. Plaintiff have suffered the harm alleged and have no interests antagonistic to any other Class member.

e. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests do not conflict with the interests of the Class Members. Furthermore, Plaintiff has retained competent counsel experienced in class action litigation, consumer protection litigation, and electronic privacy litigation. Plaintiff's counsel will fairly and adequately protect and represent the interests of the Class. Federal Rule of Civil Procedure 23(a)(4) and 23(g) are satisfied.

8
CLASS ACTION COMPLAINT

f.      In acting as alleged above, and in failing and refusing to cease and desist despite being exposed, Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and corresponding declaratory relief each appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants.

g.      Injunctive relief is necessary to prevent further unlawful and unfair conduct by Defendants. Money damages, alone, could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendants from continuing to commit their illegal and unfair violations of privacy.

## VI.    CAUSES OF ACTION

### Count One
### (Violations of CIPA, Cal. Pen. Code §§ 630, et seq.)

30.      Plaintiff incorporates all preceding factual allegations as if fully set forth here.

31.      Cal. Pen. Code § 630 provides that "[t]he Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communication and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

32.      Defendants' acts and practices complained of herein, engaged in for purposes of tracking, viewing, and cataloguing the private video footage of its users without their consent—and indeed in direct contravention of Defendants' own advertisements promising the privacy of that footage—violated and continues to violate Cal. Pen. Code § 632.

33.      Cal. Pen. Code § 632 prohibits the use of "an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device . . . ."

CLASS ACTION COMPLAINT

34. In direct violation of this prohibition and without the consent of Plaintiff or Class Members, Defendants have been using AI technology to eavesdrop and record the confidential videos of Plaintiff and Class Members on Meta AI Glasses.

35. Defendants accessed or caused to be accessed Plaintiff's and Class Members' private communications from California. On information and belief, Meta uses servers located in California that allow Defendants to access private communications of Plaintiff and Class Members. Meta's terms of service indicate that California law controls the use of its services.

36. As a result of Defendants' violations of Cal. Pen. Code § 632, Plaintiff and Class Members are entitled to the following relief:

    a. A declaration that Defendants' conduct violates CIPA;

    b. Statutory damages and/or trebled actual damages;

    c. Injunctive relief in the form of, inter alia, an order enjoining Defendants from continuing to access Class Members' private communications in violation of CIPA;

    d. Injunctive relief in the form of, inter alia, an order requiring Defendants to destroy all data created or otherwise obtained from its illegal tracking of Class Members' private communications; and

    e. An award of attorney's fees and costs of litigation as provided by CIPA, the private attorney general doctrine existing at common law and also codified at California Civil Code Section 1021.5, and all other applicable laws.

### Count Two
### (Intrusion Upon Seclusion)

37. Plaintiff incorporates all preceding factual allegations as if fully set forth here.

38. Plaintiff and Class Members have reasonable expectations of privacy in the video footage from their Meta AI Glasses. Plaintiff's and Class Members' private affairs include private communications and events captured in this footage.

39. The reasonableness of such expectations of privacy is supported by Defendants' unique position to monitor Plaintiff's and Class Members' private communications and lives through its access

10

CLASS ACTION COMPLAINT

to Plaintiff's and Class Members' Meta AI Glasses footage. It is further supported by the surreptitious nature of Defendants' tracking.

40. Defendants intentionally intruded on and into Plaintiff's and Class Members' solitude, seclusion, or private affairs by intentionally using AI video footage to track their private lives and communications.

41. These intrusions are highly offensive to a reasonable person. The video footage captured on Meta AI Glasses are reasonably considered private. Moreover, Defendants engaged in AI and human tracking deceptively and without the informed consent of Plaintiff and Class Members. Also supporting the highly offensive nature of Defendants' conduct is the fact that surreptitiously tracked this footage without informing or obtaining the consent of Plaintiff and Class Members while simultaneously advertising Meta AI Glasses as being "designed for privacy, controlled by you."

42. Plaintiff and Class Members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

43. Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiff and Class Members.

44. As a result of Defendants' actions, Plaintiff and Class Members seek damages and punitive damages in an amount to be determined at trial. Plaintiff and Class Members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiff and Class Members and made in conscious disregard of Plaintiff's and Class Members' privacy rights. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

### Count Three
**(California Constitutional Right to Privacy, Cal. Const. Art. I, § 1)**

45. Plaintiff incorporates all preceding factual allegations as if fully set forth here.

46. Plaintiff and Class Members have reasonable expectations of privacy in the video footage captured by their Meta AI Glasses. Plaintiff's and Class Members' private affairs include communications contained in these accounts.

47. Defendants intentionally intruded on and into Plaintiff's and Class Members' solitude, seclusion, right of privacy, or private affairs by intentionally tracking the video footage.

48. These intrusions are highly offensive to a reasonable person. The video footage captured on Meta AI Glasses are reasonably considered private. Moreover, Defendants engaged in AI and human tracking deceptively and without the informed consent of Plaintiff and Class Members. Also supporting the highly offensive nature of Defendants' conduct is the fact that surreptitiously tracked this footage without informing or obtaining the consent of Plaintiff and Class Members while simultaneously advertising Meta AI Glasses as being "designed for privacy, controlled by you."

49. Plaintiff and Class Members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

50. Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiff and Class Members.

51. As a result of Defendants' actions, Plaintiff and Class Members seek damages and punitive damages in an amount to be determined at trial. Plaintiff and Class Members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiff and Class Members and made in conscious disregard of Plaintiff's and Class Members' privacy rights. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

### Count Four
**(Violations of CDAFA, Cal. Pen. Code § 502)**

52. Plaintiff incorporates all preceding factual allegations as if fully set forth here.

53. The California legislature enacted CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code §502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . unauthorized access to computers, computer systems, and computer data." *Id*.

CLASS ACTION COMPLAINT

54. Plaintiff's and Class Members' Meta AI Glasses constitute "computers" within the scope of CDAFA.

55. Defendants violated the following sections of CDAFA:

a. Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

b. Section 502(c)(2), which makes it unlawful to "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;" and

c. Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

56. Defendants knowingly accessed Plaintiff's and Class Members' video footage captured by Meta AI Glasses without their permission by surreptitiously tracking, viewing, and cataloguing data, communications, and personal information concerning Plaintiff and Class Members.

57. Defendants used data, communications, and personal information that it intercepted and took from Plaintiff's and Class Members' Meta AI Glasses to wrongfully and unjustly enrich themselves at the expense of Plaintiff and Class Members.

58. Defendants took, copied, intercepted, and made use of data, communications, and personal information from Plaintiff's and Class Members' Meta AI Glasses.

59. Defendants knowingly and without Plaintiff's and Class Members' permission accessed or caused to be accessed their video footage captured by Meta AI Glasses by surreptitiously intercepting and/or taking data, communications, and personal information concerning Plaintiff and Class Members.

60. Defendants accessed or caused to be accessed Plaintiff's and Class Members' data, communications, and personal information from California. On information and belief, Meta uses servers located in California that allow Defendants to access and process the data, communications and

13

CLASS ACTION COMPLAINT

personal information concerning Plaintiff and Class Members. Meta's terms of service indicate that California law controls the use of its services.

61. Defendants were unjustly enriched by intercepting, acquiring, taking, or using Plaintiff's and Class Members' data, communications, and personal information without their permission, and using it for Defendants' own financial benefit. Defendants have been unjustly enriched in an amount to be determined at trial.

62. As a direct and proximate result of Defendants' violations of CDAFA, Plaintiff and Class Members suffered damages.

63. Pursuant to CDAFA Section 502(e)(1), Plaintiff and Class Members seek compensatory, injunctive, and equitable relief in an amount to be determined at trial.

64. Pursuant to CDAFA Section 502(e)(2), Plaintiff and Class Members seek an award of reasonable attorney's fees and costs.

65. Pursuant to CDAFA Section 502(e)(4), Plaintiff and Class Members seek punitive or exemplary damages for Defendants' willful violations of CDAFA.

### Count Five
### (Violations of the SCA, 18 U.S.C. § 2701, et seq.)

66. Plaintiff incorporates all preceding factual allegations as if fully set forth here.

67. The SCA provides a cause of action against any person who "intentionally accesses without authorization a facility through which an electronic communication service is provided," or any person "who intentionally exceeds an authorization to access that facility; and thereby obtains, alters or prevents authorized access to a wire or electronic communication while it is in electronic storage in such a system." 18 U.S.C. § 2701(a).

68. The SCA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof;" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

14

CLASS ACTION COMPLAINT

69. The SCA defines an "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

70. Defendants intentionally accessed without authorization or intentionally exceeded authorization to access facilities through which an electronic communications services was provided when it used its AI technology to access Plaintiff's and Class Members' video footage captured on their Meta AI Glasses for purposes of tracking their private communications.

71. The Meta AI Glasses utilized by Plaintiff and Class Members provide electronic communications services to Plaintiff and Class Members because they "provide to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

72. The Meta AI Glasses which the Plaintiff and Class Members use provide electronic communication services to Plaintiff and Class Members because they "provide to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

73. Neither the Plaintiff and Class Members nor the third parties with whom they communicated with using Meta AI Glasses authorized the extent of Defendants' access to Plaintiff's and Class Members' computing devices and Defendants' services therein.

74. Plaintiff's and Class Members' Meta AI Glasses—and the computing devices, applications, and/or web browsers through which they accessed any footage captured—also are facilities under the SCA because they comprise the software necessary for and "through which (the) electronic communications service is provided."

75. Defendants intentionally accessed Plaintiff's and Class Members' Meta AI Glasses video footage without authorization when Defendants tracked, viewed, and catalogued the footage without obtaining the consent of the Plaintiff and Class Members.

76. Upon information and belief, Defendants' acquisition of electronic communications from Plaintiff and Class Members included private communications Plaintiff and Class Members had with third parties that are not affiliated with Defendants.

---

15

CLASS ACTION COMPLAINT

77.    Plaintiff and Class Members were harmed by Defendants' violations and, pursuant to 18 U.S.C. § 2707(c), are entitled to statutory damages or actual damages, including profits earned by Defendants attributable to the violations, punitive damages, costs, and reasonable attorney's fees.

## Count Six
## (Violations of the CLRA, Cal. Civ. Code § 1750, et seq.)

78.    Plaintiff incorporates all preceding factual allegations as if fully set forth here.

79.    Plaintiff and Class Members are consumers who purchased Meta AI Glasses from Defendants for personal, family or household purposes.

80.    Plaintiff and the Class are "consumers" as that term is defined by the California Consumers Legal Remedies Act (the "CLRA") in Cal. Civ. Code § 1761(d).

81.    Defendants' Meta AI Glasses are "goods" within the meaning of Cal. Civ. Code § 1761(a).

82.    Defendants' actions, representations, and conduct are covered by the CLRA, because they extend to transactions that intended to result, or which have resulted in, the sale of goods to consumers. Defendants sold Meta AI Glasses to Plaintiff and Class Members.

83.    Cal. Civ. Code § 1770(a)(5), prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have." By engaging in the conduct set forth herein, Defendants violated and continue to violate CLRA Section 1770(a)(5) because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendants misrepresent the particular characteristics, benefits and quantities of their Meta AI Glasses.

84.    Cal. Civ. Code § 1770(a)(7) prohibits representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another. By engaging in the conduct set forth herein, Defendants violated and continues to violate CLRA Section 1770(a)(7) because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendants misrepresent the particular standard, quality or grade of their Meta AI Glasses.

16

85. Cal. Civ. Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." By engaging in the conduct set forth herein, Defendants violated and continue to violate Section 1770(a)(9), because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendants advertise their Meta AI Glasses with the intent not to sell them as advertised.

86. Cal. Civ. Code § 1770(a)(16) prohibits "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." By engaging in the conduct set forth herein, Defendants violated and continue to violate CLRA Section 1770(a)(16), because Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices, in that Defendants misrepresents that their Meta AI Glasses have been supplied in accordance with their previous representations when they have not.

87. Plaintiff and Class Members acted reasonably when they purchased Meta AI Glasses from Defendants on the belief that Defendants' representations were true and lawful. Plaintiff and Class Members suffered injuries caused by Defendants because (a) they would not have purchased Meta AI Glasses absent Defendants' representations that they would be in control of the privacy of their video footage; (b) they paid a price premium for the Meta AI Glasses they purchased from Defendants based on Defendants' misrepresentations; and (c) Defendants' Meta AI Glasses did not have the characteristics, benefits, or quantities as promised.

88. At this time, Plaintiff only seeks injunctive relief under this cause of action. In accordance with Cal. Civ. Code § 1780(a), Defendants have been provided notice in satisfaction of California Civil Code § 1782(a), and, if Defendants fail to take corrective action within the required notice period, Plaintiff will amend this cause of action to assert all claims for relief available under this cause of action, including claims for actual, punitive, and statutory damages, as appropriate.

### Count Seven
### (Violations of the UCL, Cal. Bus. & Prof. Code § 17200, et seq.)

89. Plaintiff incorporates all preceding factual allegations as if fully set forth here.

90. Cal. Bus. & Prof Code § 17200, et seq. (the "UCL") prohibits acts of "unfair competition," including any unlawful, fraudulent, or unfair business acts or practices.

91. Under the "unlawful" prong of the UCL, a violation of another law is treated as unfair competition and is independently actionable.

92. Defendants committed unlawful practices because they violated, inter alia, CIPA, CDAFA, SCA, FAL, and CLRA. Defendant's conduct as alleged herein is both unfair and deceptive.

93. Plaintiff reserves the right to allege other violations of law which constitute other unlawful business acts or practices as Defendants' conduct is ongoing and continues to this date.

94. Under the "unfair" prong of the UCL, a business practice is unfair if that practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

95. Defendants committed unfair acts and practices by, inter alia, invading Plaintiff's and Class Members' privacy while falsely advertising that their privacy would be protected.

96. Defendants' acts and practices are unfair because the gravity of the consequences of Defendants' conduct as described above outweighs any justification, motive or reason, particularly considering that Defendants violated privacy while simultaneously advertising how it would protect privacy. Defendants' acts and practices are also immoral, unethical, unscrupulous, and offend established public policy and are substantially injurious to Plaintiff and Class Members.

97. Defendant violated the fraudulent prong of the UCL by misleading Plaintiff and Class Members to believe that their privacy would be protected when recording video footage on Meta AI Glasses.

98. Plaintiff and Class Members acted reasonably when they purchased Meta AI Glasses from Defendant son the belief that their privacy rights would not be violated.

99. As a result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiff and Class Members have suffered an injury in fact and have lost money in an amount to be determined at the trial of this action.

100. Plaintiff and Class Members are entitled to an order pursuant to Cal. Bus. & Prof Code § 17203, enjoining Defendants' unlawful and unfair conduct, and such other orders and judgments necessary to disgorge Defendants' ill-gotten gains and to restore to Plaintiff and Class Members any amounts assessed and/or paid as a result of Defendants' wrongful conduct.

**Count Eight**
**(Violations of the FAL, Cal. Bus. & Prof. Code § 17500, et seq.)**

101.    Plaintiff incorporates all preceding factual allegations as if fully set forth here.

102.    California's False Advertising Law (the "FAL"), Cal. Bus. & Prof. Code §§ 17500, et seq., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

103.    Defendants advertised and promoted Meta AI Glasses by promising consumers that they would be in control of the video footage recorded by the glasses and their privacy would be protected. Defendants' advertisements and inducements were made in and originated from California and fall within the definition of advertising as contained in the FAL in that they were intended to induce consumers to purchase Meta AI Glasses. Defendants knew that those statements were false and misleading when they made them and surreptitiously tracked, viewed, and catalogued Plaintiff's and Class Members' footage.

104.    Defendants' advertising that it would protect user's privacy was false and misleading to a reasonable consumer, including Plaintiff, because Defendants in fact violated user's privacy by tracking, viewing, and cataloguing video footage from their Meta AI Glasses.

105.    Defendants knew or should have known, through the exercise of reasonable care, that their statements about Meta AI Glasses were false and misleading.

106.    Plaintiff and Class Members lost money or property as a result of Defendants' FAL violations because (a) they would not have purchased Meta AI Glasses absent Defendants' representations that they would be in control of the privacy of their video footage; (b) they would not have purchased Meta AI Glasses on the same terms absent Defendants' misrepresentations; (c) they paid a price premium for tickets based on Defendants' misrepresentations; and/or (d) Defendants' Meta AI Glasses did not have the characteristics, benefits, or quantities as promised.

19

CLASS ACTION COMPLAINT

**Count Nine**
**(Breach of Contract)**

107. Plaintiff incorporates all preceding factual allegations as if fully set forth here.

108. By representing through its prominently advertised statements for Meta AI Glasses that they were "designed for privacy" and that "You're in control of your experience," Defendants formed a contract with Plaintiff and Class Members at the time they purchased Meta AI Glasses from Defendants. Plaintiff and Class Members viewed and relied upon these privacy-related advertisements, such that they were material to their decision to purchase Meta AI Glasses from Defendants.

109. Plaintiff and Class Members fully performed their obligations under this contract by paying the purchase price for Meta AI Glasses.

110. Defendants knew that their privacy-related advertisements were material to Plaintiff's and Class Members' agreement to purchase Meta AI Glasses from Defendants.

111. Defendants breached their contracts with Plaintiff and Class Members by failing to honor the terms of their privacy-related advertisements, as they surreptitiously tracked, viewed, and catalogued Plaintiff's and Class Members' video footage from their Meta AI Glasses.

112. As the foreseeable and actual result of Defendants' breach of contract, Plaintiff and Class Members were damaged in an amount to be proven at trial.

**Count Ten**
**(Unjust Enrichment)**

113. Plaintiff incorporates all preceding factual allegations as if fully set forth here.

114. As a result of their unjust conduct, Defendants have been unjustly enriched.

115. By reason of Defendants' wrongful conduct, Defendants have benefited from receipt of improper funds, and under principles of equity and good conscience, Defendants should not be permitted to keep this money.

116. As a result of Defendants' conduct, it would be unjust and/or inequitable for Defendants to retain the benefits of their conduct without restitution to Plaintiff and Class Members. Accordingly, Defendants must account to Plaintiff and Class Members for their unjust enrichment.

20

CLASS ACTION COMPLAINT

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered against Defendants and that the Court grant the following:

A.    An order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff is a proper class representative, that Plaintiff's attorneys shall be appointed as Class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and that Class notice be promptly issued;

B.    Judgment against Defendants for Plaintiff's and Class Members' asserted causes of action;

C.    Appropriate declaratory relief against Defendants;

D.    Injunctive relief in the form of, *inter alia*, an order enjoining Defendants from continuing their practice of accessing, using, and/or storing Plaintiff's and Class Members' private communications without their knowledge or consent in violation of CIPA, CDAFA, and/or SCA;

E.    Injunctive relief in the form of, *inter alia*, an order enjoining Defendants from continuing their practice of tracking, recording, and using Plaintiff's and Class Members' private communications;

F.    An order awarding Plaintiff and the Class Members damages, special damages, general damages, and restitution;

G.    An order requiring Defendants to pay punitive damages and exemplary damages;

H.    An order requiring Defendants to pay pre-judgment and post-judgment interest;

I.    Reasonable attorney's fees and costs reasonably incurred; and

J.    Any and all other and further relief to which Plaintiff and the Class may be entitled.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

21

CLASS ACTION COMPLAINT

## VIII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: March 8, 2026

Respectfully submitted,

*/s/ Tina Wolfson*

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa D. Brown (SBN 301313)
abrown@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone:  310.474.9111
Facsimile:   310.474.8585

Bradley K. King (SBN 274399)
bking@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone:  917.336.0171
Facsimile:   917.336.0177

*Counsel for Plaintiff and the Proposed Class*

22

CLASS ACTION COMPLAINT

Case 3:26-cv-01099-EMC   Document 17-1   Filed 03/12/26   Page 37 of 118

# EXHIBIT 2

William J. Edelman (SBN: 285177)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878
wedelman@milberg.com

Alexandra M. Honeycutt (*pro hac vice
forthcoming*)
**MILBERG, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN
Telephone: (866) 252-0878
ahoneycutt@milberg.com

Heather M. Lopez (SBN: 354022)
**MILBERG, PLLC**
280 S. Beverly Drive-Penthouse,
Beverly Hills, CA 90212
Telephone: (331) 240-3015
hlopez@milberg.com

*Attorneys for the Plaintiff and the Proposed Classes*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

NICOLAS TEJADA*, on behalf of himself and
all others similarly situated*,

          Plaintiff,

v.

META PLATFORMS, INC., SAMASOURCE
IMPACT SOURCING INC., d/b/a SAMA, and
LUXOTTICA OF AMERICA, INC.

          Defendants.

Case No. 3:26-cv-02015

CLASS ACTION COMPLAINT AND
DEMAND FOR JURY TRIAL

    Plaintiff Nicolas Tejada ("Plaintiff") brings this class action complaint ("Complaint") on behalf of himself and all others similarly situated ("Class Members") against Defendant Meta Platforms, Inc. ("Meta"), Defendant Samasource Impact Sourcing, Inc., d/b/a "Sama" ("Sama"), and Defendant Luxottica of America, Inc. ("Luxottica")(collectively, "Defendants") for the privacy violations alleged herein, which are based on Plaintiff's knowledge of facts pertaining to himself and his own actions and counsel's investigations, and upon information and belief as to all other matters, are as follows:

CLASS ACTION COMPLAINT
1

## I. NATURE OF THE CASE

1. This case exposes the ugly machinery behind a sleek product and underscores the reality that Meta will stop at nothing in its pursuit of ever-increasing profit and drive toward gaining an even stronger foothold in the tech industry via AI initiatives.

2. Meta continues to misrepresent its products and services, and its AI-enabled smart glasses, which are marketed under the Ray-Ban and Oakley brands (collectively, the "Meta AI Glasses" or "Glasses"), are the latest in a multi-decade pattern of bad conduct that, by design, invades the lives of ordinary citizens and bystanders.

3. Meta designs, controls, and operates the AI software, cloud infrastructure, and data pipelines embedded in these Glasses.

4. Sama is Meta's subcontractor responsible for the human review and annotation of video, audio, and image data captured by the Meta AI Glasses.

5. Meta transmits footage captured through the Glasses—including highly intimate recordings of users in their homes, bedrooms, and bathrooms—to Sama's data annotation facilities in Nairobi, Kenya, where thousands of human workers manually view, label, and assess that footage to train Meta's artificial intelligence models.

6. Meta markets its AI Glasses as an "all-in-one assistant" that empowers wearers to "remain in control of their privacy."[1] The opposite is true.

7. When a user activates the Glasses by pressing a physical button or uttering the wake phrase "Hey Meta," the device captures high-resolution video and audio and transmits that data through the user's smartphone to Meta's cloud servers and Sama's processing center.[2]

8. From there, Meta routes selected footage into a data annotation pipeline managed by Sama, where low-wage contractors in Nairobi sit in rows of cubicles, drawing bounding boxes

---

[1] Naipanoi Lepapa et al., *She Came Out of the Bathroom Naked, Employee Says*, Svenska Dagbladet (Feb. 27, 2026).

[2] Meta, *Supplemental Meta Platforms Technologies Privacy Policy* (Oct. 21, 2025).

CLASS ACTION COMPLAINT

2

around objects, labeling images, checking transcriptions, and performing quality assurance all while viewing, in full resolution, the most private moments of unsuspecting Americans' lives.

9. The content these workers see is staggering. Multiple Sama employees were interviewed by Swedish investigative journalists and described footage of people using bathrooms, undressing, engaging in sexual activity, and inadvertently exposing bank card details and other financial information.[3]

10. One worker recounted: "I saw a video where a man puts the glasses on the bedside table and leaves the room. Shortly afterwards his wife comes in and changes her clothes."[4] Another stated: "*We see everything—from living rooms to naked bodies*. Meta has that type of content in its databases."[5] A third described sex scenes filmed with the Glasses: "*someone is wearing them having sex. That is why this is so extremely sensitive*."[6]

11. Plaintiff brings this class action on behalf of a Nationwide Class and a Florida Subclass and seeks compensatory, statutory, and punitive damages, disgorgement, and injunctive and declaratory relief for Meta's violations of (1) the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510–2522; (2) the Florida Security of Communications Act ("FSCA"), Fla. Stat. §§ 934.01–934.50; (3) Invasion of Privacy; and (4) Unjust Enrichment.

## II. THE PARTIES

### A. Plaintiff

12. Plaintiff is a citizen and resident of Broward County, Florida, and has resided in Florida at all times relevant to this Complaint. In or around October 3, 2025, Plaintiff purchased the Oakley Meta Vanguard from Meta.com for approximately $533.93.

---

[3] Lepapa et al., *She Came Out of the Bathroom Naked*, Svenska Dagbladet (Feb. 27, 2026).

[4] *Id.*

[5] *Id.*

[6] *Id.*

13. Plaintiff purchased the Meta AI Glasses in reliance on Meta's widespread marketing and advertising campaign, including representations that the glasses were "designed for privacy," "controlled by you," and "built for your privacy and others too."

14. Plaintiff used the Meta AI Glasses' voice-activated AI assistant feature by speaking the wake phrase "Hey Meta" to ask questions, identify objects, and utilize other AI-powered features advertised by Meta.

15. When Plaintiff used these AI features, the Meta AI Glasses captured video and audio of Plaintiff's surroundings and transmitted this content to Meta's servers in real time.

16. On numerous occasions, Plaintiff used the Meta AI Glasses while in his home, including in private spaces where he had a reasonable expectation of privacy.

17. Plaintiff was not informed, and did not consent to, Meta routing his captured video and audio footage to third-party human contractors employed by Sama in Nairobi, Kenya, for manual review, annotation, and use in training Meta's AI models.

18. At the time of purchase, Plaintiff was unaware of any disclaimer or other explicit notice stating Meta would use his private video and audio recordings without his permission.

19. Plaintiff would not have purchased the Meta AI Glasses, or would have paid substantially less for them, had he known that intimate video and audio from his home would be viewed by human workers overseas.

20. Plaintiff is experiencing feelings of anxiety, stress, fear, and frustration as a result of the invasion of his privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a victim that the law contemplates and addresses. Plaintiff has suffered harm including invasion of privacy, loss of the benefit of his bargain, and statutory damages as set forth herein.

**B. Defendants**

21. Defendant **Meta Platforms, Inc.** is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California 94025. Meta designs, manufactures (in partnership with EssilorLuxottica S.A.), distributes, markets, and sells the Meta AI Glasses. Meta owns and operates the AI software, cloud infrastructure, data processing systems, and contractual

CLASS ACTION COMPLAINT
4

relationships through which user-captured footage flows from the Glasses to Meta's servers and onward to its subcontractors. Meta controls the data pipeline at every stage: from the on-device wake-word detection system, to the smartphone app that serves as the connectivity intermediary, to the cloud servers that receive and store the footage, to the annotation queues that route footage to human reviewers, to the AI models that consume the resulting labeled data. Meta generated over $200 billion in revenue in fiscal year 2025.[7]

22.    Defendant **Samasource Impact Sourcing, Inc.**, d/b/a **Sama**, is a Delaware corporation with its principal offices at 2017 Mission Street, Suite 301, San Francisco, California 94110. Sama operates data annotation facilities on Mombasa Road in Nairobi, Kenya, where it employs thousands of data annotators who manually review, label, and annotate video, audio, and image data for Meta and other technology clients. Sama workers assigned to Meta's AI Glasses project review footage captured by the Glasses' cameras—including intimate footage of users and individuals in their vicinity—to train Meta's AI models. Sama operates under Meta's direction and control, executing annotation tasks according to Meta's specifications, within an intensely monitored work environment that bans personal smartphones and surveils the workforce with cameras.

23.    **Defendant Luxottica of America, Inc.** is an Ohio corporation with its principal place of business located at 4000 Luxottica Place, Mason, OH 45040-8114. On information and belief, Luxottica of America, Inc., in partnership with Meta, advertises, markets, and sells the Meta AI Glasses throughout the United States. The unfair, unlawful, deceptive, and misleading Challenged Representations and Omissions on the Products were prepared, authorized, ratified, and/or approved by Luxottica and its agents, and were disseminated throughout California and the nation by Luxottica and its agents to deceive and mislead consumers in the State of California and throughout the United States into purchasing the Meta AI Glasses.

---

[7] *See, e.g.*, *Meta's AI Transformation: Analyzing the Llama Integration and the $200 Billion Ad-Tech Engine*, FinTerra (Jan. 27, 2026).

## III. FACTUAL ALLEGATIONS

### A. Meta's Transition from Social Media Platform to AI Competitor

24. Meta produces the Meta AI Glasses in partnership with EssilorLuxottica S.A., the French-Italian eyewear conglomerate that owns the Ray-Ban and Oakley brands. The current product lineup includes: the Ray-Ban Meta (first and second generation), the Oakley Meta HSTN, the Oakley Meta Vanguard, and the Meta Ray-Ban Display.[8]

25. The Glasses are powered by a Qualcomm Snapdragon AR1 Gen1 system-on-chip and feature integrated 12-megapixel cameras capable of capturing both still photographs and high-definition video, a multi-microphone array for voice capture and ambient audio recording, open-ear speakers, and Bluetooth and Wi-Fi connectivity for data transmission.

26. The Glasses operate in two recording modes. First, users can manually capture photos and video by pressing a physical button on the right temple of the frame. Second, users can activate Meta's AI assistant by speaking the wake phrase "Hey Meta," which triggers the Glasses to begin recording audio and, in many modes, video, and to transmit that data to Meta's cloud servers for AI processing.

27. Meta markets the Glasses as a revolutionary personal assistant. At Meta Connect in September 2025, CEO Mark Zuckerberg personally demonstrated the Glasses, preaching that they would serve as an "all-in-one assistant" offering live translation, visual recognition, travel guidance, and real-time information.[9] Meta touts the Glasses as a device that lets users "remain in control of their privacy."[10]

28. That representation is false. As described herein, Meta designed the Glasses to capture intimate audiovisual data, transmit it to remote servers, and route it to overseas contractors

---

[8] *See* Uploadvr.com, *Meta & EssilorLuxottica Sold 7 Million Smart Glasses in 2025* (Feb. 11, 2026).

[9] Lepapa et al., *She Came Out of the Bathroom Naked*, Svenska Dagbladet (Feb. 27, 2026).

[10] *Id.*

for human review—while burying the scope of this data collection across a thicket of fragmented, misleading, and contradictory privacy policies.

29. The Glasses have achieved explosive commercial success. EssilorLuxottica reported in its Q4 2025 earnings that it sold over seven million AI-enabled smart glasses in 2025 alone—more than tripling the two million units sold in 2023 and 2024 combined.[11] Based on EssilorLuxottica's reported North American revenue share of approximately 46%, an estimated 3.2 million of these units were sold in the United States. The companies are now discussing plans to increase annual production capacity to 20–30 million units.

30. Meta's AI Glasses are not an isolated product—they are a central pillar of Meta's corporate transformation from a social media platform into an AI infrastructure company. Meta has staked its future on artificial intelligence, and the Glasses are the hardware vehicle through which Meta intends to embed its AI into the physical world.

31. Meta spent approximately $38–40 billion on capital expenditures in 2024 and raised its 2025 capital expenditure outlook to $64–72 billion, directed primarily at AI infrastructure, including data centers, GPU clusters, and model training.[12] Meta projects capital expenditures nearing $100 billion in 2026. [13]

32. Meta's AI strategy centers on its proprietary Llama series of large language models ("LLMs"). Meta released Llama 2 in 2023, Llama 3 in 2024, and Llama 4 in early 2025.[14] Llama 4 provides the backbone for Meta AI, the AI assistant integrated into WhatsApp, Instagram, and—critically—the Meta AI Glasses. Meta AI reached over one billion monthly active users.[15]

---

[11] CNBC, *Ray-Ban Maker EssilorLuxottica Triples Sales of Meta AI Glasses* (Feb. 11, 2026).

[12] *See* Constellationr.com, *Meta Ups Its 2025 Spending on AI, Data Centers* (Apr. 30, 2025).

[13] FinTerra, *Analyzing the Llama Integration and the $200 Billion Ad-Tech Engine* (Jan. 27, 2026).

[14] *See* Yahoo Finance, *Why Meta Platforms' Open-Source AI Strategy Might Win the Long Game* (Oct. 17, 2025).

[15] Gizmodo, *Meta's New Privacy Policy Opens Up AI Chats for Targeted Ads* (Jan. 1, 2026).

CLASS ACTION COMPLAINT

33. The AI Glasses are uniquely important to Meta's strategy because they are the only Meta product that captures real-world audiovisual data from the physical environment. Unlike Facebook or Instagram—which receive data that users voluntarily upload—the Glasses passively capture the world around the wearer: their home, their family, their conversations, their most private moments. This captured data is the raw material Meta needs to train its multimodal AI models to understand and interpret the physical world. On the Q2 2025 earnings call, Zuckerberg stated: "I think AI glasses are gonna be the main way that we integrate superintelligence into our day-to-day lives."[16]

34. Meta has constructed an AI ecosystem in which the Glasses are the sensory input, the Llama models are the processing engine, and Meta's advertising platform, which reached a $60 billion annual run rate through its AI-driven Advantage+ system in 2025, is the monetization output.[17] The data captured from users through the Glasses feeds directly into this monetization model: better training data produces smarter models, smarter models produce better ad targeting, and better ad targeting produces more revenue.

35. Meta's entire AI architecture depends on a continuous supply of real-world audiovisual training data—data that is extracted from millions of users under a framework designed to maximize collection while minimizing transparency.

**B. Meta's Glasses Intercept, Transmit, Record, and Divulge Highly Sensitive Data Without Users' (or Bystanders) Knowledge or Consent**

36. When a user activates the AI function on the Meta AI Glasses, whether by pressing the capture button or speaking "Hey Meta," the Glasses capture audio and video data and transmit it via Bluetooth (or Wi-Fi when available) to the user's paired smartphone running the Meta AI app. The smartphone performs intermediate processing (including HDR rendering and image stabilization) and then transmits the data to Meta's cloud servers.

---

[16] https://www.bloomberg.com/news/articles/2026-01-13/meta-said-to-discuss-doubling-ray-ban-glasses-output-after-surge-in-demand (last visited Mar. 9, 2026).

[17] FinTerra, *Analyzing the Llama Integration and the $200 Billion Ad-Tech Engine* (Jan. 27, 2026).

37.     Meta operates approximately 24 data center campuses globally, with at least 18 operational facilities in the United States, and additional facilities in the EU. Testing by Swedish investigative journalists confirmed consistent data transmissions from the Glasses to Meta servers during normal operation.

38.     When users ask Meta AI questions about what they see, the Glasses transmit data to Meta's cloud for AI processing, which is then used to improve Meta products and train its AI.

39.     However, Meta does not disclose which cloud infrastructure receives this data, where data reviewers are located, or that its data reviewers are actually underpaid data annotators employed by a commercial subcontractor on another continent, 7,000 miles away.

40.     From Meta's servers, selected footage enters a data annotation pipeline managed by Sama in Nairobi, Kenya. The onward transfer of user data from Meta's U.S. servers to Sama's Nairobi annotation queues is the legally operative data flow for the claims alleged herein—a cross-border transfer confirmed by contractor testimony and the Swedish investigation.

41.     On February 27, 2026, Swedish newspapers Svenska Dagbladet and Göteborgs-Posten published a joint investigation, titled "Your Eyes, Their Data" (Swedish: *Dina ögon, deras data*), based on interviews with more than thirty employees at different levels of Sama's Nairobi operations. The investigation was conducted in collaboration with Naipanoi Lepapa, an award-winning investigative freelance journalist based in Nairobi.

42.     The reporters met Sama workers at a hotel in Nairobi, at a safe distance from Sama's offices on Mombasa Road. Some workers arrived straight from night shifts; others were preparing for ten-hour shifts. All spoke on condition of anonymity because they had signed extensive confidentiality agreements and feared termination—and with it, a return to poverty.

43.     The workers described what they see on their screens every day. Multiple Sama employees working specifically on annotating videos, images, and speech for Meta's AI systems reported seeing footage of:

- **Bathroom visits**: People using toilets and bathing, captured by Glasses left in bathrooms or worn by household members;

- **Nudity**: Individuals undressing, captured unknowingly—for example, a man placed his Glasses on a bedside table, and the still-recording device captured his wife entering the room and changing clothes;

- **Sexual activity**: Sex scenes filmed by users wearing the Glasses during intercourse;

- **Financial information**: Bank cards, credit cards, and other sensitive financial documents visible on screen; and

- **Private conversations**: Text transcriptions of "any topics at all," including discussions of crimes, protests, and sexually explicit descriptions of other people.[18]

44. One worker stated: "In some videos you can see someone going to the toilet, or getting undressed. I don't think they know, because if they knew they wouldn't be recording."[19]

45. Another stated: "We see everything—from living rooms to naked bodies. Meta has that type of content in its databases. People can record themselves in the wrong way and not even know what they are recording. They are real people like you and me."[20] A third described the footage as capable of triggering "enormous scandals" if leaked.[21]

46. One worker described the psychological burden: "When you see these videos, it feels that way [like looking into someone's private life]. But since it is a job, you have to do it. You understand that it is someone's private life you are looking at, but at the same time you are just expected to carry out the work. You are not supposed to question it. If you start asking questions, you are gone."[22]

47. Meta's purported safeguard for this pipeline—an automatic face-blurring algorithm—does not reliably function. A former Meta employee acknowledged this failure: "The

---

[18] Lepapa et al., *She Came Out of the Bathroom Naked*, Svenska Dagbladet (Feb. 27, 2026).

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

algorithms sometimes miss. Especially in difficult lighting conditions, certain faces and bodies become visible."[23]

48. The journalists also purchased their own pair of Meta AI Glasses and tested them. They found that: (a) the AI functions cannot operate solely through local, on-device processing—an internet connection is required; (b) network traffic analysis showed frequent and consistent data transmissions to Meta servers; and (c) the claim made by retail sales staff that "nothing is shared" with Meta and that "everything stays locally in the app" is demonstrably false.[24]

49. Meta was given two months to respond to the journalists' questions about how the company informs users about the Glasses, what filters prevent private material from reaching annotators, how the chain of subcontractors is audited, and why footage showing extremely private situations reaches annotation queues. After two months, Meta's spokesperson in London, Joyce Omope, responded with a letter that did not directly answer any of the questions—instead referring the journalists to Meta's AI terms of use and privacy policy.[25]

50. When asked to explain how sharing highly private material with subcontractors in Kenya can be reconciled with its privacy policy, Meta and Sama did not respond.[26]

51. Meta's refusal to address these specific questions, despite extended lead time, underscores that consumers were never provided clear, direct notice of human review of intimate content.

**C. Class Members Did Not Consent to Meta's Conduct**

  **i. Meta's Conduct Exceeds Any Purported Consent, and Its Privacy Policies Are Fragmented and Inadequate**

52. Meta's privacy disclosure framework for the AI Glasses is spread across no fewer than four separate documents: (1) the Supplemental Meta Platforms Technologies Privacy Policy;

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

(2) the Meta AI Terms of Service; (3) the Meta Voice Controls Privacy Notice; and (4) the Supplemental Meta Platforms Technologies Terms of Service. Each document cross-references the others, creating a labyrinth of disclosures that no reasonable consumer would read in full, let alone synthesize into a coherent understanding of how their data is actually used.

53. This fragmentation is not accidental, it is by design. The critical disclosures about human review are buried in subsections nominally about voice recording storage, separated from the default-on disclosures about transcript storage. A user who reads only the primary privacy policy—which is itself lengthy and densely cross-referenced—would not learn that "trained reviewers" means underpaid data annotators employed by a commercial subcontractor in Nairobi, Kenya. Meta never defines "trained reviewers" in any of its policies.

54. Simply put, Meta does not specify what "third parties" means, does not name Sama, does not identify Kenya as a processing location, and it does not describe ***human review of intimate video footage***.

55. All of this information is and was highly relevant to Plaintiff and Class Members when they decided to purchase and use the Glasses.

56. At no point in any of Meta's privacy documents does Meta disclose: (a) that intimate video footage—including nudity, sexual activity, and bathroom visits—is reviewed by human annotators; (b) that those annotators are employed by Sama, a commercial data-labeling subcontractor; (c) that the annotation takes place in Nairobi, Kenya; (d) that Meta's face-anonymization algorithm frequently fails, leaving faces and bodies visible to reviewers; or (e) that footage captured during false or accidental activations of the "Hey Meta" wake word also enters the annotation pipeline.

57. No reasonable consumer reading Meta's privacy policies—individually or collectively—would understand that wearing the Glasses in their home could result in footage of their spouse undressing, their child bathing, or their private conversations being transmitted to a warehouse in Kenya and viewed by strangers.

CLASS ACTION COMPLAINT

12

ii.     **Meta's Framework Fails to Provide a Reasonable Opt-Out**

58.     On April 29, 2025, Meta fundamentally restructured the default privacy settings for the AI Glasses. Prior to that date, users could choose whether to enable Meta AI with camera functionality and could toggle voice recording storage on or off. After April 29, 2025, Meta enabled Meta AI with camera functionality by default on all Glasses.[27] Meta simultaneously removed the option for users to opt out of voice recording storage entirely.

59.     Following the April 2025 change, voice recordings and transcripts are stored by default and may be retained for up to one year. The only mechanism now available to users who wish to avoid retention is to manually delete each individual recording from the app—a per-recording burden that no reasonable consumer would undertake for every AI interaction. Unintended activations ("false wakes") are supposed to be deleted within 90 days, but even that reduced period means Meta retains recordings of conversations the user never intended to initiate. The Decoder.

60.     Meta communicated the April 2025 changes through a generic email to existing users that described the update as a routine privacy policy update. Meta did not use the words "opt-out removed," "setting discontinued," or "you must now manually delete" in this email notice.

61.     As such, any continued use does not constitute acceptance or consent given that Meta's unilateral amendment lacks adequate notice of material changes.[28]

62.     For video data captured during Live AI sessions, Users have no way to know how long Meta retains video of their homes, their families, and their most private moments—or when, if ever, that data is deleted.

---

[27] TechCrunch https://techcrunch.com/2025/04/30/if-you-own-ray-ban-meta-glasses-you-should-double-check-your-privacy-settings/ (last visited Mar. 5, 2026).

[28] *See Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014).

CLASS ACTION COMPLAINT

13

**D.** **Technical Framework**

  **i.**    **Data Flows from the Glasses to Sama's Annotation Queues**

63. The Meta AI Glasses operate on a four-stage data architecture. The Glasses contain an on-device microcontroller for wake-word detection (the "Hey Meta" trigger) and a Qualcomm Snapdragon AR1 Gen1 system-on-chip for audio/video capture. When "Hey Meta" is detected—or the capacitive capture button is pressed—the device begins recording and transmitting data. The audio and video data are transmitted via Bluetooth (or Wi-Fi when available) to the paired smartphone running the Meta AI app and Meta's cloud infrastructure. The data on Meta's servers enters the data annotation pipeline managed by Sama in Nairobi, Kenya. Sama workers manually review the footage: drawing bounding boxes around objects, assigning labels, checking transcriptions, and performing quality assurance. The labeled data is then used to train and refine Meta's AI models.

64. A single "Hey Meta" invocation in a user's living room results in: (a) on-device audio and video capture; (b) wireless transmission to the paired smartphone and Meta's cloud servers; and (c) potential routing of the footage to a human annotator in Kenya who views, labels, and annotates the content. At no stage does the user receive real-time notice that their footage may be viewed by a human being.

65. The "Hey Meta" wake-word detection system is imprecise, and Meta's policies define voice interactions to include accidental activations and background sound during interactions.

66. The imprecision of the wake-word system means that the Glasses may begin recording at any time in response to ambient speech—capturing conversations the user never intended to record and never knew were being transmitted to Meta's servers.

  **ii.**    **Statutory Framework**

67. The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–2522, prohibits the intentional interception, disclosure, and use of wire, oral, or electronic communications. 18 U.S.C. § 2511(1). The statute provides a private right of action under 18 U.S.C. § 2520, with statutory damages of the greater of $100 per day for each day of violation or $10,000, plus actual

damages, profits made by the violator, punitive damages, and reasonable attorneys' fees. 18 U.S.C. § 2520(c)(2).

68.     Although the ECPA contains a one-party consent exception—permitting interception where one party to the communication has consented—that exception does not apply "where such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). This is known as the "crime-tort exception."

69.     Recent decisions in this District, have held that plaintiffs adequately alleged invasion of privacy sufficient to trigger the ECPA crime-tort exception.

70.     Meta's conduct satisfies the crime-tort exception. Meta intercepts users' private communications—including audio, video, and text transmitted through the Glasses to its servers and onward to Sama—for the purpose of committing the independent tort of intrusion upon seclusion. Meta's purpose in intercepting this data is to train its AI models, which Meta accomplishes by routing intimate footage of private moments to human annotators in Kenya. The routing of video showing nudity, sexual activity, bathroom visits, and financial information to overseas contractors for manual viewing—without adequate notice or consent—constitutes an intentional intrusion upon the solitude and seclusion of Plaintiff and Class Members that would be highly offensive to any reasonable person. Because Meta's interception of these communications is undertaken for the purpose of this tortious conduct, the one-party consent exception is inapplicable, and Meta's ECPA liability attaches.

71.     The Florida Security of Communications Act, Fla. Stat. § 934.03, independently prohibits the intentional interception of wire, oral, or electronic communications without the consent of *all* parties to the communication. Unlike the federal ECPA, Florida is an all-party-consent jurisdiction: no interception is lawful unless every person whose communication is captured has given prior consent. Fla. Stat. § 934.03(2)(d). Moreover, it is independently "unlawful to intercept any wire, oral, or electronic communication for the purpose of committing any criminal act." Fla. Stat. § 934.03(2)(e).

72.     The FSCA provides a private right of action under Fla. Stat. § 934.10. Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.03–934.09 is entitled to recover: (a) preliminary, equitable, or declaratory relief; (b) actual damages, but not less than liquidated damages computed at the rate of $100 per day for each day of violation, or $1,000, whichever is higher; (c) punitive damages; and (d) reasonable attorneys' fees and litigation costs. Fla. Stat. § 934.10(1).

73.     Meta's conduct violates the FSCA because it intercepts the oral and electronic communications of Florida Class Members—audio and video captured by the Glasses and transmitted to Meta's servers and Sama's annotation queues—without obtaining the consent of all parties to those communications. Florida users who speak in the presence of the Glasses, whose conversations are captured by the "Hey Meta" activation (whether intentional or accidental), and whose footage is transmitted to Meta and Sama, have not consented to interception by Meta's data annotation contractors. The FSCA's all-party-consent requirement demands affirmative consent from every person whose communication is intercepted—not merely from the wearer who pressed the button or spoke the wake word.

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action on behalf of himself and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and seeks certification of the following Classes:

**Nationwide Class**: All persons residing in the United States who, during the Class Period,[29] used Meta AI Glasses and whose audio, video, or electronic communications were intercepted, recorded, transmitted, stored, or disclosed by Meta and/or Sama.

**Florida Subclass**: All persons residing in the State of Florida who, during the Class Period, used Meta AI Glasses and whose wire, oral, or electronic communications were intercepted, recorded, transmitted, stored, or disclosed by Meta and/or Sama.

---

[29] Plaintiff's understanding of Meta's conduct is still evolving. As such, the "Class Period" is the earliest date permitted by law through present.

75. **Excluded** from the Classes are: (a) Defendants and any entity in which either has a controlling interest; (b) the current and former officers, directors, and employees of Defendants; (c) the judges and court staff assigned to this matter; and (d) counsel for all parties.

76. **Numerosity.** The Classes are so numerous that joinder of all members is impracticable. EssilorLuxottica reported sales of over seven million AI-enabled smart glasses in 2025 alone, with an estimated 3.2 million units sold in the United States.[30] The precise size of the Classes is currently unknown to Plaintiff but is readily ascertainable through Meta's own records, which track registered device owners and their geographic locations. Each Class consists of well over a million individuals.

77. **Predominant Common Questions.** The Classes' claims present several questions of law and fact common to all members that predominate over any questions affecting individual Class Members, including:

(a) Whether Meta intercepted, recorded, transmitted, stored, or disclosed Class Members' communications through the Meta AI Glasses;

(b) Whether Meta's interception of Class Members' communications was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d);

(c) Whether Meta's conduct constitutes intrusion upon seclusion;

(d) Whether Meta's privacy policies provided adequate notice of, or obtained valid consent for, the human review of Class Members' footage by Sama contractors;

(e) Whether Meta violated the ECPA, 18 U.S.C. §§ 2510–2522;

(f) Whether Meta and/or Sama violated the FSCA, Fla. Stat. §§ 934.03–934.09;

(g) Whether Meta was unjustly enriched by its interception and use of Class Members' communications; and

---

[30] https://www.cnbc.com/2026/02/11/ray-ban-maker-essilorluxottica-triples-sales-of-meta-ai-glasses.html (last visited Mar. 6, 2026).

(h) Whether Plaintiff and Class Members are entitled to damages, including statutory, compensatory, and punitive damages, disgorgement, and injunctive relief.

78. **Typicality.** Plaintiff's claims are typical of all Class Members because they arise from the same course of conduct by Defendants and are based on the same legal theories. Plaintiff used the Meta AI Glasses, and Plaintiff's communications were intercepted, transmitted, stored, and disclosed to Sama in the same manner as all Class Members.

79. **Adequate Representation.** Plaintiff will fairly and adequately represent the Classes and protect the interests of all Class Members. Plaintiff has retained competent counsel with significant experience in class action and data privacy litigation. Plaintiff and counsel have no interests that conflict with the interests of the Classes and are not subject to any unique defenses. Plaintiff and counsel will vigorously prosecute this action to advance the interests of the Classes and have the resources necessary to do so.

80. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class Members is impracticable. Individual litigation would impose an unreasonable burden on the courts and on the parties, would create a risk of inconsistent or contradictory judgments, and would be inefficient given that the claims arise from uniform conduct directed at millions of consumers. Class-wide adjudication provides comprehensive oversight by a single court and avoids duplicative proceedings.

81. Plaintiff reserves all rights to revise or modify the class allegations based on facts and legal developments following additional investigation or discovery.

## IV. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–2522
### On Behalf of Plaintiff and the Nationwide Class

82. Plaintiff re-alleges and incorporates the paragraphs 1 through 79 above as if fully restated herein.

83. The ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication. 18 U.S.C. § 2511(1)(a).

CLASS ACTION COMPLAINT
18

84. The ECPA further prohibits any person from intentionally disclosing, or endeavoring to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of such a communication in violation of the Act. 18 U.S.C. § 2511(1)(c).

85. The ECPA further prohibits any person from intentionally using, or endeavoring to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of such a communication in violation of the Act. 18 U.S.C. § 2511(1)(d).

86. Meta intentionally intercepted Plaintiff's and Class Members' wire, oral, and electronic communications by capturing audio and video data through the Meta AI Glasses and transmitting that data to its cloud servers and onward to Sama's annotation facilities in Kenya—without adequate notice or consent.

87. Meta intentionally disclosed the contents of Plaintiff's and Class Members' intercepted communications by transmitting that footage to Sama, a third-party commercial subcontractor, for manual human review and annotation.

88. Meta intentionally used the contents of Plaintiff's and Class Members' intercepted communications to train and refine its AI models, enhance its products, and power its advertising platform.

89. Although 18 U.S.C. § 2511(2)(d) provides a consent exception where one party to the communication has consented, that exception is inapplicable here because Meta intercepted Plaintiff's and Class Members' communications "for the purpose of committing [a] criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

90. Specifically, Meta intercepted Plaintiff's and Class Members' communications for the purpose of committing the tort of intrusion upon seclusion, as described in the Fourth Cause of Action below. Meta's interception and onward transmission of intimate footage—including nudity, sexual activity, bathroom visits, and private conversations—to overseas contractors for manual viewing constitutes an intentional intrusion upon the solitude and seclusion of Plaintiff and

CLASS ACTION COMPLAINT
19

Class Members that is highly offensive to a reasonable person. Because Meta's purpose in intercepting these communications was to commit this independent tortious act, the one-party consent exception does not shield Meta from ECPA liability. *See Semien v. PubMatic Inc.*, No. 5:24-cv-05765 (N.D. Cal.); *Krzyzek v. OpenX Techs., Inc.*, No. 5:24-cv-06379 (N.D. Cal.).

91. Meta's violations of the ECPA are ongoing and continuous. Each day that Meta intercepts, discloses, and uses Plaintiff's and Class Members' communications without lawful consent constitutes a separate violation of the statute.

92. Pursuant to 18 U.S.C. § 2520, Plaintiff and the Nationwide Class are entitled to: (a) preliminary, equitable, and declaratory relief; (b) damages, including actual damages and any profits made by Meta as a result of its violations, or statutory damages of the greater of $100 per day for each day of violation or $10,000, whichever is greater; (c) punitive damages; and (d) reasonable attorneys' fees and litigation costs.

**SECOND CAUSE OF ACTION**
**Violation of the Florida Security of Communications Act, Fla. Stat. §§ 934.03–934.10**
**On Behalf of Plaintiff and the Florida Subclass**

93. Plaintiff re-alleges and incorporates paragraphs 1 through 79 above as if fully restated herein.

94. The FSCA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication. Fla. Stat. § 934.03(1)(a).

95. Florida is an all-party-consent jurisdiction. It is lawful to intercept a wire, oral, or electronic communication only "when all of the parties to the communication have given prior consent to such interception." Fla. Stat. § 934.03(2)(d). The FSCA further makes it independently "unlawful to intercept any wire, oral, or electronic communication for the purpose of committing any criminal act." Fla. Stat. § 934.03(2)(e).

96. Meta intentionally intercepted the wire, oral, and electronic communications of the Florida Subclass Members by capturing audio and video data through the Meta AI Glasses and transmitting that data to its servers and to Sama's annotation facilities—without obtaining the consent of all parties to those communications.

CLASS ACTION COMPLAINT
20

97. Florida Subclass Members did not consent to the interception of their communications by Meta's data annotation subcontractor Sama. Florida Subclass Members did not consent to having their voice recordings, video footage, and private conversations transmitted to human reviewers in Kenya. The FSCA's all-party-consent requirement demands affirmative consent from every person whose communication is intercepted—consent that Meta never obtained.

98. Pursuant to Fla. Stat. § 934.10, Plaintiff and the Florida Subclass are entitled to recover: (a) preliminary, equitable, or declaratory relief; (b) actual damages, but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1,000, whichever is higher; (c) punitive damages; and (d) reasonable attorneys' fees and litigation costs.

**THIRD CAUSE OF ACTION**
**Intrusion Upon Seclusion**
**On Behalf of Plaintiff and the Nationwide Class**

99. Plaintiff re-alleges and incorporates paragraphs 1 through 79 above as if fully restated herein.

100. The Restatement (Second) of Torts § 652B provides that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

101. Meta intentionally intruded upon Plaintiff's and Class Members' solitude and seclusion by: (a) intercepting and recording their private audio and video communications through the Meta AI Glasses; (b) transmitting that footage—including recordings of nudity, sexual activity, bathroom visits, and private conversations—to its cloud servers; (c) routing that footage to Sama's annotation facilities in Nairobi, Kenya, where human workers manually viewed the recordings in full resolution; and (d) using the annotated data to train and refine Meta's AI models and enhance its advertising business.

102. Plaintiff and Class Members had a reasonable expectation of privacy in their homes, bathrooms, bedrooms, and private conversations. The types of footage described herein—nudity,

sexual activity, bathroom visits, bank card exposure, and intimate conversations—are among the most private categories of human experience.

103. Meta's intrusion is highly offensive to a reasonable person. Recording a person undressing or using the bathroom in their own home, transmitting that footage across the internet to a server farm, and routing it to a warehouse in Kenya where strangers manually view, label, and annotate the content—all to train a commercial AI product—is conduct that shocks the conscience.

104. Meta's intrusion is made more offensive by: (a) the vast scale of the surveillance, involving millions of users across the United States; (b) the intimacy of the footage, which captures people in their most vulnerable private moments; (c) Meta's active concealment of the scope and nature of the human review; (d) Meta's deliberate removal of opt-out mechanisms in April 2025; (e) the cross-border transfer of intimate footage to a third-party contractor in a country with no EU-equivalent data protection adequacy determination; and (f) Meta's acknowledged failure to reliably anonymize the footage before human review.

105. Meta's conduct caused Plaintiff and Class Members harm, including violation of their privacy interests, emotional distress, and loss of control over highly intimate personal information.

106. Plaintiff and Class Members seek compensatory damages, disgorgement of profits, and punitive damages. Meta's conduct was willful, knowing, and carried out with conscious disregard for Plaintiff's and Class Members' rights.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**On Behalf of Plaintiff and the Nationwide Class**

107. Plaintiff re-alleges and incorporates paragraphs 1 through 79 above as if fully restated herein and pleads this claim in the alternative to the legal remedies alleged herein.

108. Meta received substantial benefits from Plaintiff and Class Members in the form of their private audio, video, and electronic communications. Meta acquired this data without adequate notice or consent and without providing corresponding compensation.

109. Meta used this private data for its own commercial benefit, including: training and refining its Llama AI models; improving its Meta AI assistant; enhancing its advertising targeting

capabilities through the AI-driven Advantage+ platform; and increasing the value of its products and services. Meta's AI Glasses data pipeline directly fed the monetization flywheel that generated over $200 billion in annual revenue in fiscal year 2025.

110. Had Plaintiff and Class Members known the true scope of Meta's data practices—including that their most intimate moments would be viewed by human annotators in Kenya—they would not have purchased the Glasses or used the AI features, and they would not have agreed to Meta's collection and use of their data.

111. Meta unjustly retained these benefits at the expense of Plaintiff and Class Members. It is inequitable under principles of unjust enrichment for Meta to retain the profits and other benefits derived from its unauthorized interception and exploitation of Plaintiff's and Class Members' private communications.

112. Meta should be compelled to disgorge these profits and other inequitable proceeds in a common fund for the benefit of Plaintiff and Class Members.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order:

a. Certifying the Nationwide Class and Florida Subclass and appointing Plaintiff as Class Representative;

b. Appointing Plaintiff's counsel as Class Counsel;

c. Finding Meta's conduct unlawful;

d. Awarding injunctive and declaratory relief, including an order permanently enjoining Meta from intercepting, recording, transmitting, storing, or disclosing Plaintiff's and Class Members' private communications without lawful consent, requiring Meta to delete all footage obtained in violation of law, and further requiring Meta to provide clear, conspicuous notice of any human review of AI Glasses recordings and meaningful mechanisms to disable or limit such review;

e. Awarding statutory damages under 18 U.S.C. § 2520 to Plaintiff and the Nationwide Class;

f.     Awarding statutory damages under Fla. Stat. § 934.10 to Plaintiff and the Florida Subclass;

g.     Awarding compensatory, actual, and nominal damages;

h.     Awarding punitive damages;

i.     Awarding disgorgement of all profits and revenues Meta obtained through its unlawful conduct;

j.     Awarding pre- and post-judgment interest as provided by law;

k.     Awarding reasonable attorneys' fees, costs, and expenses; and

l.     Granting such other and further relief as the Court deems just and proper.

Dated: March 9, 2026

/s/ *William J. Edelman*
William J. Edelman (SBN: 285177)
**MILBERG, PLLC**
227 West Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
wedelman@milberg.com

Heather M. Lopez (SBN: 354022)
**MILBERG, PLLC**
280 S. Beverly Drive-Penthouse,
Beverly Hills, CA 90212
Telephone: (331) 240-3015
hlopez@milberg.com

Alexandra M. Honeycutt (*pro hac vice forthcoming*)
**MILBERG, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN
Telephone: (866) 252-0878
ahoneycutt@milberg.com

Case 3:26-cv-01099-EMC   Document 7-1   Filed 03/12/26   Page 54 of 118

# EXHIBIT 3

**KOPELOWIT   OSTROW P.A.**
Kristen Lake Cardoso (SBN 338762)
cardoso@kolawyers.com
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100

*Attorney for the Plaintiff and the Proposed Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ARSHAM KOSARI*, on behalf of himself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT AND<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Arsham Kosari ("Plaintiff") brings this class action complaint ("Complaint") on behalf of himself and all others similarly situated ("Class Members") against Defendant Meta Platforms, Inc. ("Meta"), Defendant Samasource Impact Sourcing, Inc., d/b/a Sama ("Sama"), and Defendant Luxottica of America, Inc. ("Luxottica")(collectively, "Defendants") for the privacy violations alleged herein, which are based on Plaintiff's knowledge of facts pertaining to himself and his own actions and counsel's investigations, and upon information and belief as to all other matters, are as follows:

## I. NATURE OF THE CASE

1.      This case arises out of the inappropriate use of Plaintiff's and Class Members' private recordings on their Meta AI Glasses and specifically, Meta unlawfully sharing the audio and visual recordings to enhance and train its large language models.

CLASS ACTION COMPLAINT
1

2.      Meta continues to misrepresent its products and services, and its AI-enabled smart glasses, which are marketed under the Ray-Ban and Oakley brands (collectively, the "Meta AI Glasses" or "Glasses"), are the latest in a multi-decade pattern of bad conduct that, by design, invades the lives of ordinary citizens and bystanders.

3.      Meta designs, controls, and operates the AI software, cloud infrastructure, and data pipelines embedded in these Glasses.

4.      Sama is Meta's subcontractor responsible for the human review and annotation of video, audio, and image data captured by the Meta AI Glasses.

5.      Meta transmits footage captured through the Glasses—including highly intimate recordings of users in their homes, bedrooms, and bathrooms—to Sama's data annotation facilities in Nairobi, Kenya, where thousands of human workers manually view, label, and assess that footage to train Meta's artificial intelligence models.

6.      Meta markets its AI Glasses as an "all-in-one assistant" that empowers wearers to "remain in control of their privacy."[1] The opposite is true.

7.      When a user activates the Glasses by pressing a physical button or uttering the wake phrase "Hey Meta," the device captures high-resolution video and audio and transmits that data through the user's smartphone to Meta's cloud servers and Sama's processing center.[2]

8.      From there, Meta routes selected footage into a data annotation pipeline managed by Sama, where low-wage contractors in Nairobi sit in rows of cubicles, drawing bounding boxes around objects, labeling images, checking transcriptions, and performing quality assurance all while viewing, in full resolution, the most private moments of unsuspecting Americans' lives.

9.      The content these workers see is staggering. Multiple Sama employees were interviewed by Swedish investigative journalists and described footage of people using bathrooms,

---

[1] Naipanoi Lepapa et al., *She Came Out of the Bathroom Naked, Employee Says*, Svenska Dagbladet (Feb. 27, 2026).

[2] Meta, *Supplemental Meta Platforms Technologies Privacy Policy* (Oct. 21, 2025).

CLASS ACTION COMPLAINT

2

undressing, engaging in sexual activity, and inadvertently exposing bank card details and other financial information.[3]

10. One worker recounted: "I saw a video where a man puts the glasses on the bedside table and leaves the room. Shortly afterwards his wife comes in and changes her clothes."[4] Another stated: "*We see everything—from living rooms to naked bodies*. Meta has that type of content in its databases."[5] A third described sex scenes filmed with the Glasses: "*someone is wearing them having sex. That is why this is so extremely sensitive*."[6]

11. Plaintiff brings this class action on behalf of a Nationwide Class and a Florida Subclass and seeks compensatory, statutory, and punitive damages, disgorgement, and injunctive and declaratory relief for Meta's violations of (1) the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510–2522; (2) the Florida Security of Communications Act ("FSCA"), Fla. Stat. §§ 934.01–934.50; (3) Invasion of Privacy; and (4) Unjust Enrichment.

## II. THE PARTIES

### A. Plaintiff

12. Plaintiff is a citizen and resident of Broward County, Florida, and has resided in Florida at all times relevant to this Complaint. In or around April 2025 Plaintiff received the Ray-Ban Meta Skyler (Gen 1) as a gift.

13. Plaintiff desired and obtained the Meta AI Glasses in reliance on Meta's widespread marketing and advertising campaign, including representations that the glasses were "designed for privacy," "controlled by you," and "built for your privacy and others too."

14. Plaintiff used the Meta AI Glasses' voice-activated AI assistant feature by speaking the wake phrase "Hey Meta" to ask questions, identify objects, and utilize other AI-powered features advertised by Meta.

---

[3] Lepapa et al., *She Came Out of the Bathroom Naked*, Svenska Dagbladet (Feb. 27, 2026).

[4] *Id.*

[5] *Id.*

[6] *Id.*

15.     When Plaintiff used these AI features, the Meta AI Glasses captured video and audio of Plaintiff's surroundings and transmitted this content to Meta's servers in real time.

16.     On numerous occasions, Plaintiff used the Meta AI Glasses while in his home, including in private spaces where he had a reasonable expectation of privacy.

17.     Plaintiff was not informed, and did not consent to, Meta routing his captured video and audio footage to third-party human contractors employed by Sama in Nairobi, Kenya, for manual review, annotation, and use in training Meta's AI models.

18.     Plaintiff is experiencing feelings of anxiety, stress, fear, and frustration as a result of the invasion of his privacy. This goes far beyond allegations of mete worry or inconvenience; it is exactly the sort of injury and harm to a victim that the law contemplates and addresses.

19.     Plaintiff does not recall Meta disclosing any disclaimers or explicit warnings about its intent to copy and share his private audio and visual recordings.

20.     Plaintiff has suffered harm including invasion of privacy, loss of the benefit of his bargain, and statutory damages as set forth herein.

**B.     Defendants**

21.     Defendant **Meta Platforms, Inc.** is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California 94025. Meta designs, manufactures (in partnership with EssilorLuxottica S.A.), distributes, markets, and sells the Meta AI Glasses. Meta owns and operates the AI software, cloud infrastructure, data processing systems, and contractual relationships through which user-captured footage flows from the Glasses to Meta's servers and onward to its subcontractors. Meta controls the data pipeline at every stage: from the on-device wake-word detection system, to the smartphone app that serves as the connectivity intermediary, to the cloud servers that receive and store the footage, to the annotation queues that route footage to human reviewers, to the AI models that consume the resulting labeled data. Meta generated over $200 billion in revenue in fiscal year 2025.[7]

---

[7] *See, e.g.*, *Meta's AI Transformation: Analyzing the Llama Integration and the $200 Billion Ad-Tech Engine*, FinTerra (Jan. 27, 2026).

22.     Defendant **Samasource Impact Sourcing, Inc.**, d/b/a **Sama**, is a Delaware corporation with its principal offices at 2017 Mission Street, Suite 301, San Francisco, California 94110. Sama operates data annotation facilities on Mombasa Road in Nairobi, Kenya, where it employs thousands of data annotators who manually review, label, and annotate video, audio, and image data for Meta and other technology clients. Sama workers assigned to Meta's AI Glasses project review footage captured by the Glasses' cameras—including intimate footage of users and individuals in their vicinity—to train Meta's AI models. Sama operates under Meta's direction and control, executing annotation tasks according to Meta's specifications, within an intensely monitored work environment that bans personal smartphones and surveils the workforce with cameras.

23.     **Defendant Luxottica of America, Inc.** is an Ohio corporation with its principal place of business located at 4000 Luxottica Place, Mason, OH 45040-8114. On information and belief, Luxottica of America, Inc., in partnership with Meta, advertises, markets, and sells the Meta AI Glasses throughout the United States. The unfair, unlawful, deceptive, and misleading Challenged Representations and Omissions on the Products were prepared, authorized, ratified, and/or approved by Luxottica and its agents, and were disseminated throughout California and the nation by Luxottica and its agents to deceive and mislead consumers in the State of California and throughout the United States into purchasing the Meta AI Glasses.

## III. FACTUAL ALLEGATIONS

### A.     Meta's Transition from Social Media Platform to AI Competitor

24.     Meta produces the Meta AI Glasses in partnership with EssilorLuxottica S.A., the French-Italian eyewear conglomerate that owns the Ray-Ban and Oakley brands. The current product lineup includes: the Ray-Ban Meta (first and second generation), the Oakley Meta HSTN, the Oakley Meta Vanguard, and the Meta Ray-Ban Display.[8]

---

[8] *See* Uploadvr.com, *Meta & EssilorLuxottica Sold 7 Million Smart Glasses in 2025* (Feb. 11, 2026).

25. The Glasses are powered by a Qualcomm Snapdragon AR1 Gen1 system-on-chip and feature integrated 12-megapixel cameras capable of capturing both still photographs and high-definition video, a multi-microphone array for voice capture and ambient audio recording, open-ear speakers, and Bluetooth and Wi-Fi connectivity for data transmission.

26. The Glasses operate in two recording modes. First, users can manually capture photos and video by pressing a physical button on the right temple of the frame. Second, users can activate Meta's AI assistant by speaking the wake phrase "Hey Meta," which triggers the Glasses to begin recording audio and, in many modes, video, and to transmit that data to Meta's cloud servers for AI processing.

27. Meta markets the Glasses as a revolutionary personal assistant. At Meta Connect in September 2025, CEO Mark Zuckerberg personally demonstrated the Glasses, preaching that they would serve as an "all-in-one assistant" offering live translation, visual recognition, travel guidance, and real-time information.[9] Meta touts the Glasses as a device that lets users "remain in control of their privacy."[10]

28. That representation is false. As described herein, Meta designed the Glasses to capture intimate audiovisual data, transmit it to remote servers, and route it to overseas contractors for human review—while burying the scope of this data collection across a thicket of fragmented, misleading, and contradictory privacy policies.

29. The Glasses have achieved explosive commercial success. EssilorLuxottica reported in its Q4 2025 earnings that it sold over seven million AI-enabled smart glasses in 2025 alone—more than tripling the two million units sold in 2023 and 2024 combined.[11] Based on EssilorLuxottica's reported North American revenue share of approximately 46%, an estimated 3.2 million of these units were sold in the United States. The companies are now discussing plans to increase annual production capacity to 20–30 million units.

[9] Lepapa et al., *She Came Out of the Bathroom Naked*, Svenska Dagbladet (Feb. 27, 2026).

[10] *Id.*

[11] CNBC, *Ray-Ban Maker EssilorLuxottica Triples Sales of Meta AI Glasses* (Feb. 11, 2026).

CLASS ACTION COMPLAINT

6

30.     Meta's AI Glasses are not an isolated product—they are a central pillar of Meta's corporate transformation from a social media platform into an AI infrastructure company. Meta has staked its future on artificial intelligence, and the Glasses are the hardware vehicle through which Meta intends to embed its AI into the physical world.

31.     Meta spent approximately $38–40 billion on capital expenditures in 2024 and raised its 2025 capital expenditure outlook to $64–72 billion, directed primarily at AI infrastructure, including data centers, GPU clusters, and model training.[12] Meta projects capital expenditures nearing $100 billion in 2026. [13]

32.     Meta's AI strategy centers on its proprietary Llama series of large language models ("LLMs"). Meta released Llama 2 in 2023, Llama 3 in 2024, and Llama 4 in early 2025.[14] Llama 4 provides the backbone for Meta AI, the AI assistant integrated into WhatsApp, Instagram, and—critically—the Meta AI Glasses. Meta AI reached over one billion monthly active users.[15]

33.     The AI Glasses are uniquely important to Meta's strategy because they are the only Meta product that captures real-world audiovisual data from the physical environment. Unlike Facebook or Instagram—which receive data that users voluntarily upload—the Glasses passively capture the world around the wearer: their home, their family, their conversations, their most private moments. This captured data is the raw material Meta needs to train its multimodal AI models to understand and interpret the physical world. On the Q2 2025 earnings call, Zuckerberg stated: "I think AI glasses are gonna be the main way that we integrate superintelligence into our day-to-day lives."[16]

---

[12] *See* Constellationr.com, *Meta Ups Its 2025 Spending on AI, Data Centers* (Apr. 30, 2025).

[13] FinTerra, *Analyzing the Llama Integration and the $200 Billion Ad-Tech Engine* (Jan. 27, 2026).

[14] *See* Yahoo Finance, *Why Meta Platforms' Open-Source AI Strategy Might Win the Long Game* (Oct. 17, 2025).

[15] Gizmodo, *Meta's New Privacy Policy Opens Up AI Chats for Targeted Ads* (Jan. 1, 2026).

[16] https://www.bloomberg.com/news/articles/2026-01-13/meta-said-to-discuss-doubling-ray-ban-glasses-output-after-surge-in-demand (last visited Mar. 9, 2026).

CLASS ACTION COMPLAINT

34.     Meta has constructed an AI ecosystem in which the Glasses are the sensory input, the Llama models are the processing engine, and Meta's advertising platform, which reached a $60 billion annual run rate through its AI-driven Advantage+ system in 2025, is the monetization output.[17] The data captured from users through the Glasses feeds directly into this monetization model: better training data produces smarter models, smarter models produce better ad targeting, and better ad targeting produces more revenue.

35.     Meta's entire AI architecture depends on a continuous supply of real-world audiovisual training data—data that is extracted from millions of users under a framework designed to maximize collection while minimizing transparency.

### B.     Meta's Glasses Intercept, Transmit, Record, and Divulge Highly Sensitive Data Without Users' (or Bystanders) Knowledge or Consent

36.     When a user activates the AI function on the Meta AI Glasses, whether by pressing the capture button or speaking "Hey Meta," the Glasses capture audio and video data and transmit it via Bluetooth (or Wi-Fi when available) to the user's paired smartphone running the Meta AI app. The smartphone performs intermediate processing (including HDR rendering and image stabilization) and then transmits the data to Meta's cloud servers.

37.     Meta operates approximately 24 data center campuses globally, with at least 18 operational facilities in the United States, and additional facilities in the EU. Testing by Swedish investigative journalists confirmed consistent data transmissions from the Glasses to Meta servers during normal operation.

38.     When users ask Meta AI questions about what they see, the Glasses transmit data to Meta's cloud for AI processing, which is then used to improve Meta products and train its AI.

39.     However, Meta does not disclose which cloud infrastructure receives this data, where data reviewers are located, or that its data reviewers are actually underpaid data annotators employed by a commercial subcontractor on another continent, 7,000 miles away.

---

[17] FinTerra, *Analyzing the Llama Integration and the $200 Billion Ad-Tech Engine* (Jan. 27, 2026).

40. From Meta's servers, selected footage enters a data annotation pipeline managed by Sama in Nairobi, Kenya. The onward transfer of user data from Meta's U.S. servers to Sama's Nairobi annotation queues is the legally operative data flow for the claims alleged herein—a cross-border transfer confirmed by contractor testimony and the Swedish investigation.

41. On February 27, 2026, Swedish newspapers Svenska Dagbladet and Göteborgs-Posten published a joint investigation, titled "Your Eyes, Their Data" (Swedish: *Dina ögon, deras data*), based on interviews with more than thirty employees at different levels of Sama's Nairobi operations. The investigation was conducted in collaboration with Naipanoi Lepapa, an award-winning investigative freelance journalist based in Nairobi.

42. The reporters met Sama workers at a hotel in Nairobi, at a safe distance from Sama's offices on Mombasa Road. Some workers arrived straight from night shifts; others were preparing for ten-hour shifts. All spoke on condition of anonymity because they had signed extensive confidentiality agreements and feared termination—and with it, a return to poverty.

43. The workers described what they see on their screens every day. Multiple Sama employees working specifically on annotating videos, images, and speech for Meta's AI systems reported seeing footage of:

- **Bathroom visits**: People using toilets and bathing, captured by Glasses left in bathrooms or worn by household members;

- **Nudity**: Individuals undressing, captured unknowingly—for example, a man placed his Glasses on a bedside table, and the still-recording device captured his wife entering the room and changing clothes;

- **Sexual activity**: Sex scenes filmed by users wearing the Glasses during intercourse;

- **Financial information**: Bank cards, credit cards, and other sensitive financial documents visible on screen; and

- **Private conversations**: Text transcriptions of "any topics at all," including discussions of crimes, protests, and sexually explicit descriptions of other people.[18]

---

[18] Lepapa et al., *She Came Out of the Bathroom Naked*, Svenska Dagbladet (Feb. 27, 2026).

44. One worker stated: "In some videos you can see someone going to the toilet, or getting undressed. I don't think they know, because if they knew they wouldn't be recording."[19]

45. Another stated: "We see everything—from living rooms to naked bodies. Meta has that type of content in its databases. People can record themselves in the wrong way and not even know what they are recording. They are real people like you and me."[20] A third described the footage as capable of triggering "enormous scandals" if leaked.[21]

46. One worker described the psychological burden: "When you see these videos, it feels that way [like looking into someone's private life]. But since it is a job, you have to do it. You understand that it is someone's private life you are looking at, but at the same time you are just expected to carry out the work. You are not supposed to question it. If you start asking questions, you are gone."[22]

47. Meta's purported safeguard for this pipeline—an automatic face-blurring algorithm—does not reliably function. A former Meta employee acknowledged this failure: "The algorithms sometimes miss. Especially in difficult lighting conditions, certain faces and bodies become visible."[23]

48. The journalists also purchased their own pair of Meta AI Glasses and tested them. They found that: (a) the AI functions cannot operate solely through local, on-device processing—an internet connection is required; (b) network traffic analysis showed frequent and consistent data transmissions to Meta servers; and (c) the claim made by retail sales staff that "nothing is shared" with Meta and that "everything stays locally in the app" is demonstrably false.[24]

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

CLASS ACTION COMPLAINT
10

49. Meta was given two months to respond to the journalists' questions about how the company informs users about the Glasses, what filters prevent private material from reaching annotators, how the chain of subcontractors is audited, and why footage showing extremely private situations reaches annotation queues. After two months, Meta's spokesperson in London, Joyce Omope, responded with a letter that did not directly answer any of the questions—instead referring the journalists to Meta's AI terms of use and privacy policy.[25]

50. When asked to explain how sharing highly private material with subcontractors in Kenya can be reconciled with its privacy policy, Meta and Sama did not respond.[26]

51. Meta's refusal to address these specific questions, despite extended lead time, underscores that consumers were never provided clear, direct notice of human review of intimate content.

**C.      Class Members Did Not Consent to Meta's Conduct**

>  **i.      Meta's Conduct Exceeds Any Purported Consent, and Its Privacy Policies Are Fragmented and Inadequate**

52. Meta's privacy disclosure framework for the AI Glasses is spread across no fewer than four separate documents: (1) the Supplemental Meta Platforms Technologies Privacy Policy; (2) the Meta AI Terms of Service; (3) the Meta Voice Controls Privacy Notice; and (4) the Supplemental Meta Platforms Technologies Terms of Service. Each document cross-references the others, creating a labyrinth of disclosures that no reasonable consumer would read in full, let alone synthesize into a coherent understanding of how their data is actually used.

53. This fragmentation is not accidental, it is by design. The critical disclosures about human review are buried in subsections nominally about voice recording storage, separated from the default-on disclosures about transcript storage. A user who reads only the primary privacy policy—which is itself lengthy and densely cross-referenced—would not learn that "trained

[25] *Id.*

[26] *Id.*

reviewers" means underpaid data annotators employed by a commercial subcontractor in Nairobi, Kenya. Meta never defines "trained reviewers" in any of its policies.

54. Simply put, Meta does not specify what "third parties" means, does not name Sama, does not identify Kenya as a processing location, and it does not describe ***human review of intimate video footage***.

55. All of this information is and was highly relevant to Plaintiff and Class Members when they decided to purchase and use the Glasses.

56. At no point in any of Meta's privacy documents does Meta disclose: (a) that intimate video footage—including nudity, sexual activity, and bathroom visits—is reviewed by human annotators; (b) that those annotators are employed by Sama, a commercial data-labeling subcontractor; (c) that the annotation takes place in Nairobi, Kenya; (d) that Meta's face-anonymization algorithm frequently fails, leaving faces and bodies visible to reviewers; or (e) that footage captured during false or accidental activations of the "Hey Meta" wake word also enters the annotation pipeline.

57. No reasonable consumer reading Meta's privacy policies—individually or collectively—would understand that wearing the Glasses in their home could result in footage of their spouse undressing, their child bathing, or their private conversations being transmitted to a warehouse in Kenya and viewed by strangers.

### ii. Meta's Framework Fails to Provide a Reasonable Opt-Out

58. On April 29, 2025, Meta fundamentally restructured the default privacy settings for the AI Glasses. Prior to that date, users could choose whether to enable Meta AI with camera functionality and could toggle voice recording storage on or off. After April 29, 2025, Meta enabled Meta AI with camera functionality by default on all Glasses.[27] Meta simultaneously removed the option for users to opt out of voice recording storage entirely.

---

[27] TechCrunch https://techcrunch.com/2025/04/30/if-you-own-ray-ban-meta-glasses-you-should-double-check-your-privacy-settings/ (last visited Mar. 9, 2026).

59. Following the April 2025 change, voice recordings and transcripts are stored by default and may be retained for up to one year. The only mechanism now available to users who wish to avoid retention is to manually delete each individual recording from the app—a per-recording burden that no reasonable consumer would undertake for every AI interaction. Unintended activations ("false wakes") are supposed to be deleted within 90 days, but even that reduced period means Meta retains recordings of conversations the user never intended to initiate.

60. Meta communicated the April 2025 changes through a generic email to existing users that described the update as a routine privacy policy update. Meta did not use the words "opt-out removed," "setting discontinued," or "you must now manually delete" in this email notice.

61. As such, any continued use does not constitute acceptance or consent given that Meta's unilateral amendment lacks adequate notice of material changes.[28]

62. For video data captured during Live AI sessions, Users have no way to know how long Meta retains video of their homes, their families, and their most private moments—or when, if ever, that data is deleted.

**D. Technical Framework**

**i. Data Flows from the Glasses to Sama's Annotation Queues**

63. The Meta AI Glasses operate on a four-stage data architecture. The Glasses contain an on-device microcontroller for wake-word detection (the "Hey Meta" trigger) and a Qualcomm Snapdragon AR1 Gen1 system-on-chip for audio/video capture. When "Hey Meta" is detected—or the capacitive capture button is pressed—the device begins recording and transmitting data. The audio and video data are transmitted via Bluetooth (or Wi-Fi when available) to the paired smartphone running the Meta AI app and Meta's cloud infrastructure. The data on Meta's servers enters the data annotation pipeline managed by Sama in Nairobi, Kenya. Sama workers manually review the footage: drawing bounding boxes around objects, assigning labels, checking transcriptions, and performing quality assurance. The labeled data is then used to train and refine Meta's AI models.

---

[28] *See Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014).

64. A single "Hey Meta" invocation in a user's living room results in: (a) on-device audio and video capture; (b) wireless transmission to the paired smartphone and Meta's cloud servers; and (c) potential routing of the footage to a human annotator in Kenya who views, labels, and annotates the content. At no stage does the user receive real-time notice that their footage may be viewed by a human being.

65. The "Hey Meta" wake-word detection system is imprecise, and Meta's policies define voice interactions to include accidental activations and background sound during interactions.

66. The imprecision of the wake-word system means that the Glasses may begin recording at any time in response to ambient speech—capturing conversations the user never intended to record and never knew were being transmitted to Meta's servers.

### ii. Statutory Framework

67. The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–2522, prohibits the intentional interception, disclosure, and use of wire, oral, or electronic communications. 18 U.S.C. § 2511(1). The statute provides a private right of action under 18 U.S.C. § 2520, with statutory damages of the greater of $100 per day for each day of violation or $10,000, plus actual damages, profits made by the violator, punitive damages, and reasonable attorneys' fees. 18 U.S.C. § 2520(c)(2).

68. Although the ECPA contains a one-party consent exception—permitting interception where one party to the communication has consented—that exception does not apply "where such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). This is known as the "crime-tort exception."

69. Recent decisions in this District, have held that plaintiffs adequately alleged invasion of privacy sufficient to trigger the ECPA crime-tort exception.

70. Meta's conduct satisfies the crime-tort exception. Meta intercepts users' private communications—including audio, video, and text transmitted through the Glasses to its servers and onward to Sama—for the purpose of committing the independent tort of intrusion upon

CLASS ACTION COMPLAINT
14

seclusion. Meta's purpose in intercepting this data is to train its AI models, which Meta accomplishes by routing intimate footage of private moments to human annotators in Kenya. The routing of video showing nudity, sexual activity, bathroom visits, and financial information to overseas contractors for manual viewing—without adequate notice or consent—constitutes an intentional intrusion upon the solitude and seclusion of Plaintiff and Class Members that would be highly offensive to any reasonable person. Because Meta's interception of these communications is undertaken for the purpose of this tortious conduct, the one-party consent exception is inapplicable, and Meta's ECPA liability attaches.

71. The Florida Security of Communications Act, Fla. Stat. § 934.03, independently prohibits the intentional interception of wire, oral, or electronic communications without the consent of *all* parties to the communication. Unlike the federal ECPA, Florida is an all-party-consent jurisdiction: no interception is lawful unless every person whose communication is captured has given prior consent. Fla. Stat. § 934.03(2)(d). Moreover, it is independently "unlawful to intercept any wire, oral, or electronic communication for the purpose of committing any criminal act." Fla. Stat. § 934.03(2)(e).

72. The FSCA provides a private right of action under Fla. Stat. § 934.10. Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.03–934.09 is entitled to recover: (a) preliminary, equitable, or declaratory relief; (b) actual damages, but not less than liquidated damages computed at the rate of $100 per day for each day of violation, or $1,000, whichever is higher; (c) punitive damages; and (d) reasonable attorneys' fees and litigation costs. Fla. Stat. § 934.10(1).

73. Meta's conduct violates the FSCA because it intercepts the oral and electronic communications of Florida Class Members—audio and video captured by the Glasses and transmitted to Meta's servers and Sama's annotation queues—without obtaining the consent of all parties to those communications. Florida users who speak in the presence of the Glasses, whose conversations are captured by the "Hey Meta" activation (whether intentional or accidental), and whose footage is transmitted to Meta and Sama, have not consented to interception by Meta's data annotation contractors. The FSCA's all-party-consent requirement demands affirmative consent

from every person whose communication is intercepted—not merely from the wearer who pressed the button or spoke the wake word.

## CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action on behalf of himself and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and seeks certification of the following Classes:

**Nationwide Class**: All persons residing in the United States who, during the Class Period,[29] used Meta AI Glasses and whose audio, video, or electronic communications were intercepted, recorded, transmitted, stored, or disclosed by Meta and/or Sama.

**Florida Subclass**: All persons residing in the State of Florida who, during the Class Period, used Meta AI Glasses and whose wire, oral, or electronic communications were intercepted, recorded, transmitted, stored, or disclosed by Meta and/or Sama.

75.     **Excluded** from the Classes are: (a) Defendants and any entity in which either has a controlling interest; (b) the current and former officers, directors, and employees of Defendants; (c) the judges and court staff assigned to this matter; and (d) counsel for all parties.

76.     **Numerosity.** The Classes are so numerous that joinder of all members is impracticable. EssilorLuxottica reported sales of over seven million AI-enabled smart glasses in 2025 alone, with an estimated 3.2 million units sold in the United States.[30] The precise size of the Classes is currently unknown to Plaintiff but is readily ascertainable through Meta's own records, which track registered device owners and their geographic locations. Each Class consists of well over a million individuals.

77.     **Predominant Common Questions.** The Classes' claims present several questions of law and fact common to all members that predominate over any questions affecting individual Class Members, including:

---

[29] Plaintiff's understanding of Meta's conduct is still evolving. As such, the "Class Period" is the earliest date permitted by law through present.

[30]     https://www.cnbc.com/2026/02/11/ray-ban-maker-essilorluxottica-triples-sales-of-meta-ai-glasses.html (last visited Mar. 9, 2026).

(a) Whether Meta intercepted, recorded, transmitted, stored, or disclosed Class Members' communications through the Meta AI Glasses;

(b) Whether Meta's interception of Class Members' communications was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d);

(c) Whether Meta's conduct constitutes intrusion upon seclusion;

(d) Whether Meta's privacy policies provided adequate notice of, or obtained valid consent for, the human review of Class Members' footage by Sama contractors;

(e) Whether Meta violated the ECPA, 18 U.S.C. §§ 2510–2522;

(f) Whether Meta and/or Sama violated the FSCA, Fla. Stat. §§ 934.03–934.09;

(g) Whether Meta was unjustly enriched by its interception and use of Class Members' communications; and

(h) Whether Plaintiff and Class Members are entitled to damages, including statutory, compensatory, and punitive damages, disgorgement, and injunctive relief.

78. **Typicality.** Plaintiff's claims are typical of all Class Members because they arise from the same course of conduct by Defendants and are based on the same legal theories. Plaintiff used the Meta AI Glasses, and Plaintiff's communications were intercepted, transmitted, stored, and disclosed to Sama in the same manner as all Class Members.

79. **Adequate Representation.** Plaintiff will fairly and adequately represent the Classes and protect the interests of all Class Members. Plaintiff has retained competent counsel with significant experience in class action and data privacy litigation. Plaintiff and counsel have no interests that conflict with the interests of the Classes and are not subject to any unique defenses. Plaintiff and counsel will vigorously prosecute this action to advance the interests of the Classes and have the resources necessary to do so.

80. **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class Members is impracticable. Individual litigation would impose an unreasonable burden on the courts and on the parties, would create a risk of inconsistent or contradictory judgments, and would be inefficient given that the

CLASS ACTION COMPLAINT

17

claims arise from uniform conduct directed at millions of consumers. Class-wide adjudication provides comprehensive oversight by a single court and avoids duplicative proceedings.

81. Plaintiff reserves all rights to revise or modify the class allegations based on facts and legal developments following additional investigation or discovery.

## IV. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–2522
### On Behalf of Plaintiff and the Nationwide Class

82. Plaintiff re-alleges and incorporates the paragraphs 1 through 81 above as if fully restated herein.

83. The ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication. 18 U.S.C. § 2511(1)(a).

84. The ECPA further prohibits any person from intentionally disclosing, or endeavoring to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of such a communication in violation of the Act. 18 U.S.C. § 2511(1)(c).

85. The ECPA further prohibits any person from intentionally using, or endeavoring to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of such a communication in violation of the Act. 18 U.S.C. § 2511(1)(d).

86. Meta intentionally intercepted Plaintiff's and Class Members' wire, oral, and electronic communications by capturing audio and video data through the Meta AI Glasses and transmitting that data to its cloud servers and onward to Sama's annotation facilities in Kenya—without adequate notice or consent.

87. Meta intentionally disclosed the contents of Plaintiff's and Class Members' intercepted communications by transmitting that footage to Sama, a third-party commercial subcontractor, for manual human review and annotation.

88. Meta intentionally used the contents of Plaintiff's and Class Members' intercepted communications to train and refine its AI models, enhance its products, and power its advertising platform.

89. Although 18 U.S.C. § 2511(2)(d) provides a consent exception where one party to the communication has consented, that exception is inapplicable here because Meta intercepted Plaintiff's and Class Members' communications "for the purpose of committing [a] criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

90. Specifically, Meta intercepted Plaintiff's and Class Members' communications for the purpose of committing the tort of intrusion upon seclusion, as described in the Fourth Cause of Action below. Meta's interception and onward transmission of intimate footage—including nudity, sexual activity, bathroom visits, and private conversations—to overseas contractors for manual viewing constitutes an intentional intrusion upon the solitude and seclusion of Plaintiff and Class Members that is highly offensive to a reasonable person. Because Meta's purpose in intercepting these communications was to commit this independent tortious act, the one-party consent exception does not shield Meta from ECPA liability.[31]

91. Meta's violations of the ECPA are ongoing and continuous. Each day that Meta intercepts, discloses, and uses Plaintiff's and Class Members' communications without lawful consent constitutes a separate violation of the statute.

92. Pursuant to 18 U.S.C. § 2520, Plaintiff and the Nationwide Class are entitled to: (a) preliminary, equitable, and declaratory relief; (b) damages, including actual damages and any profits made by Meta as a result of its violations, or statutory damages of the greater of $100 per day for each day of violation or $10,000, whichever is greater; (c) punitive damages; and (d) reasonable attorneys' fees and litigation costs.

**SECOND CAUSE OF ACTION**
**Violation of the Florida Security of Communications Act, Fla. Stat. §§ 934.03–934.10**
**On Behalf of Plaintiff and the Florida Subclass**

---

[31] *See Semien v. PubMatic Inc.*, No. 5:24-cv-05765 (N.D. Cal.); *Krzyzek v. OpenX Techs., Inc.*, No. 5:24-cv-06379 (N.D. Cal.).

93.     Plaintiff re-alleges and incorporates paragraphs 1 through 81 above as if fully restated herein.

94.     The FSCA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication. Fla. Stat. § 934.03(1)(a).

95.     Florida is an all-party-consent jurisdiction. It is lawful to intercept a wire, oral, or electronic communication only "when all of the parties to the communication have given prior consent to such interception." Fla. Stat. § 934.03(2)(d). The FSCA further makes it independently "unlawful to intercept any wire, oral, or electronic communication for the purpose of committing any criminal act." Fla. Stat. § 934.03(2)(e).

96.     Meta intentionally intercepted the wire, oral, and electronic communications of the Florida Subclass Members by capturing audio and video data through the Meta AI Glasses and transmitting that data to its servers and to Sama's annotation facilities—without obtaining the consent of all parties to those communications.

97.     Florida Subclass Members did not consent to the interception of their communications by Meta's data annotation subcontractor Sama. Florida Subclass Members did not consent to having their voice recordings, video footage, and private conversations transmitted to human reviewers in Kenya. The FSCA's all-party-consent requirement demands affirmative consent from every person whose communication is intercepted—consent that Meta never obtained.

98.     Pursuant to Fla. Stat. § 934.10, Plaintiff and the Florida Subclass are entitled to recover: (a) preliminary, equitable, or declaratory relief; (b) actual damages, but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1,000, whichever is higher; (c) punitive damages; and (d) reasonable attorneys' fees and litigation costs.

**THIRD CAUSE OF ACTION**
**Intrusion Upon Seclusion**
**On Behalf of Plaintiff and the Nationwide Class**

---

CLASS ACTION COMPLAINT
20

99. Plaintiff re-alleges and incorporates paragraphs 1 through 81 above as if fully restated herein.

100. The Restatement (Second) of Torts § 652B provides that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

101. Meta intentionally intruded upon Plaintiff's and Class Members' solitude and seclusion by: (a) intercepting and recording their private audio and video communications through the Meta AI Glasses; (b) transmitting that footage—including recordings of nudity, sexual activity, bathroom visits, and private conversations—to its cloud servers; (c) routing that footage to Sama's annotation facilities in Nairobi, Kenya, where human workers manually viewed the recordings in full resolution; and (d) using the annotated data to train and refine Meta's AI models and enhance its advertising business.

102. Plaintiff and Class Members had a reasonable expectation of privacy in their homes, bathrooms, bedrooms, and private conversations. The types of footage described herein—nudity, sexual activity, bathroom visits, bank card exposure, and intimate conversations—are among the most private categories of human experience.

103. Meta's intrusion is highly offensive to a reasonable person. Recording a person undressing or using the bathroom in their own home, transmitting that footage across the internet to a server farm, and routing it to a warehouse in Kenya where strangers manually view, label, and annotate the content—all to train a commercial AI product—is conduct that shocks the conscience.

104. Meta's intrusion is made more offensive by: (a) the vast scale of the surveillance, involving millions of users across the United States; (b) the intimacy of the footage, which captures people in their most vulnerable private moments; (c) Meta's active concealment of the scope and nature of the human review; (d) Meta's deliberate removal of opt-out mechanisms in April 2025; (e) the cross-border transfer of intimate footage to a third-party contractor in a country with no EU-equivalent data protection adequacy determination; and (f) Meta's acknowledged failure to reliably anonymize the footage before human review.

105. Meta's conduct caused Plaintiff and Class Members harm, including violation of their privacy interests, emotional distress, and loss of control over highly intimate personal information.

106. Plaintiff and Class Members seek compensatory damages, disgorgement of profits, and punitive damages. Meta's conduct was willful, knowing, and carried out with conscious disregard for Plaintiff's and Class Members' rights.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**On Behalf of Plaintiff and the Nationwide Class**

107. Plaintiff re-alleges and incorporates paragraphs 1 through 81 above as if fully restated herein and pleads this claim in the alternative to the legal remedies alleged herein.

108. Meta received substantial benefits from Plaintiff and Class Members in the form of their private audio, video, and electronic communications. Meta acquired this data without adequate notice or consent and without providing corresponding compensation.

109. Meta used this private data for its own commercial benefit, including: training and refining its Llama AI models; improving its Meta AI assistant; enhancing its advertising targeting capabilities through the AI-driven Advantage+ platform; and increasing the value of its products and services. Meta's AI Glasses data pipeline directly fed the monetization flywheel that generated over $200 billion in annual revenue in fiscal year 2025.

110. Had Plaintiff and Class Members known the true scope of Meta's data practices—including that their most intimate moments would be viewed by human annotators in Kenya—they would not have purchased the Glasses or used the AI features, and they would not have agreed to Meta's collection and use of their data.

111. Meta unjustly retained these benefits at the expense of Plaintiff and Class Members. It is inequitable under principles of unjust enrichment for Meta to retain the profits and other benefits derived from its unauthorized interception and exploitation of Plaintiff's and Class Members' private communications.

112. Meta should be compelled to disgorge these profits and other inequitable proceeds in a common fund for the benefit of Plaintiff and Class Members.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order:

a.  Certifying the Nationwide Class and Florida Subclass and appointing Plaintiff as Class Representative;

b.  Appointing Plaintiff's counsel as Class Counsel;

c.  Finding Meta's conduct unlawful;

d.  Awarding injunctive and declaratory relief, including an order permanently enjoining Meta from intercepting, recording, transmitting, storing, or disclosing Plaintiff's and Class Members' private communications without lawful consent, requiring Meta to delete all footage obtained in violation of law, and further requiring Meta to provide clear, conspicuous notice of any human review of AI Glasses recordings and meaningful mechanisms to disable or limit such review;

e.  Awarding statutory damages under 18 U.S.C. § 2520 to Plaintiff and the Nationwide Class;

f.  Awarding statutory damages under Fla. Stat. § 934.10 to Plaintiff and the Florida Subclass;

g.  Awarding compensatory, actual, and nominal damages;

h.  Awarding punitive damages;

i.  Awarding disgorgement of all profits and revenues Meta obtained through its unlawful conduct;

j.  Awarding pre- and post-judgment interest as provided by law;

k.  Awarding reasonable attorneys' fees, costs, and expenses; and

l.  Granting such other and further relief as the Court deems just and proper.

Dated:  March 9, 2026

/s  *Kristen Lake Cardoso*
Kristen Lake Cardoso (SBN 338762)
**KOPELOWIT   OSTROW P.A.**
One W Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
cardoso@kolawyers.com

CLASS ACTION COMPLAINT
24

# EXHIBIT 4

Philip M. Black (SBN 308619)
Samuel Coffin (*pro hac vice* application to be filed)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Email: pblack@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER CANADY, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> META PLATFORMS, INC.; and LUXOTTICA OF AMERICA, INC.; <br><br> Defendants. | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br> **CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiff Peter Canady ("Canady" or "Plaintiff"), on behalf of himself and all others similarly situated, by and through his counsel, brings this Class Action Complaint ("Complaint") against Meta Platforms, Inc. ("Meta" or "the Company") and Luxottica of America, Inc. ("Luxottica") (collectively "Defendants"). Based upon personal knowledge with respect to himself, and on information and belief and the investigation of counsel as to all other matters, in support thereof Plaintiff alleges as follows:

**INTRODUCTION**

1.      This is a proposed class action on behalf of owners of Defendants' artificial-intelligence-enabled eyeglasses ("Meta AI Glasses," "the Glasses," or "the Product").

2.      Unbeknownst to users, Meta AI Glasses make and retain audiovisual recordings even if users do not intend to make recordings. Meta then sends such recordings, which can include private and even intimate material from users' lives, to subcontractors—including a company called Sama based in Nairobi, Kenya—for analysis by human agents known as "data annotators."

3.      Defendants' conduct is a highly offensive invasion of privacy and repudiates prior promises that Defendants made about user privacy and data security. Indeed, Defendants advertised that the product was "designed for privacy controlled by you" and was "built for your privacy," and promised consumers that "You're in control of your data and content." These statements were false. And despite knowing and intending that Meta AI Glasses would take and transmit audiovisual recordings to third parties, Defendants never disclosed that fact to customers. If Defendants had done so, consumers would not have bought the glasses, and especially not at the premium prices they command. As one of the data annotators who reviewed users' private information said to the press: "You think that if [users] knew about the extent of the data collection, no one would dare to use the glasses."

4.      Defendants' conduct as alleged herein violates the federal Wiretap Act as amended by the Electronic Communications Privacy Act of 1986 ("ECPA" or the "Wiretap Act"), 18 U.S.C. § 2511(1)(a); the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 et seq.; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200; the California

CLASS ACTION COMPLAINT                                                                                    1

Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770(a)(5) and § 1770(a)(9); and New York General Business Law ("GBL") §§ 349 & 350.

## PARTIES

5.     Plaintiff Peter Canady is an individual and a resident of New Rochelle, New York.

6.     Defendant Meta Platforms, Inc. ("Meta") is Delaware corporation with a principal place of business at 1 Meta Way, Menlo Park CA 94025. According to Meta's 2025 Form 10-K, Meta's "corporate headquarters are located in Menlo Park, California" (*id.* at 51) and "California represents the majority of the [state income] tax effect" to Meta (*id.* at 122).

7.     Defendant Luxottica of America, Inc. ("Luxottica") is a Delaware corporation with a principal of business in the United States at 4000 EssilorLuxottica Place, Mason OH 45040-8114. Luxottica is the American subsidiary of multinational optical holdings company EssilorLuxottica SA. Luxottica controls a significant portion of the eyewear market in the United States through its ownership of brands including Ray-Ban, Oakley, Wayfarer and Sunglass Hut and its operation of major retailers such as LensCrafters, Pearle Vision, and Target Optical. Luxottica sells Meta AI Glasses to consumers.

8.     Together, Defendants designed, developed, marketed, and sold the Meta AI Glasses at issue herein.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States. This Court has supplemental jurisdiction over the state law claims raised herein pursuant to 28 U.S.C § 1367 because those claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy.

10.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C § 1332, because the proposed class consists of 100 or more potential class members; the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; and minimal diversity exists (Plaintiff is a citizen of New York, Defendant Meta is a citizen of California, and Defendant Luxottica is a citizen of Ohio).

CLASS ACTION COMPLAINT                                                               2

11. This Court has personal jurisdiction over Defendants because Meta's principal place of business is within this district, and Luxottica conducts substantial business in this district, including as set forth herein.

12. Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because Defendant resides within this district within the meaning of 28 U.S.C. § 1391 and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## DIVISIONAL ASSIGNMENT

13. Pursuant to Northern District of California Civil Local Rules 3-2(c), 3-2(d), and 3-5(b), assignment to the San Francisco Division of this district is proper because Defendant Meta's principal office is located in San Mateo County, California, and a substantial part of the events or omissions giving rise to the claim occurred in San Mateo County.

## FACTUAL ALLEGATIONS

### I.     Background on Meta AI Glasses

14. In 2020, Meta entered into a partnership with EssilorLuxottica to develop, market, and sell Meta AI Glasses. On September 16, 2020, Meta (then Facebook) posted on its website: "We announced a multi-year partnership with EssilorLuxottica — the makers of eyewear from Oakley and Ray-Ban to Armani, Versace, and more. Together, we'll build and release a pair of Ray-Ban branded smart glasses in 2021. They'll be designed to capture the best of both worlds — innovative technology and fashion-forward style — and help people better connect with friends and family."[1]

15. On September 9, 2021, Meta and EssilorLuxottica launched the first line of Meta AI Glasses, which were called "Ray-Ban Stories." This first line included two models, and started at a retail price of $299 per pair.[2]

---

[1] https://tech.facebook.com/reality-labs/2020/9/facebook-connect-the-road-to-ar-glasses/ (last accessed March 10, 2026).
[2] *Facebook unveils its first smart glasses*, REUTERS, (Sept. 9, 2021) https://www.reuters.com/technology/facebook-unveils-its-first-smart-glasses-2021-09-09/, (last accessed Mar. 8, 2026).

CLASS ACTION COMPLAINT                                                                3

16.     Meta and EssilorLuxottica worked closely together to develop and design the Glasses, with Meta describing the Glasses as "first product to come out of our multi-year partnership with EssilorLuxottica." In a press release announcing the launch on September 9, 2021, Meta stated:

> EssilorLuxottica, Ray-Ban's parent company, and Facebook worked together from concept through final design to seamlessly integrate smart technology into an iconic form factor, which was a great challenge in and of itself. We had to re-engineer components so that everything — that's two cameras, a set of micro-speakers, a three-microphone audio array, an optimized Snapdragon® processor, a capacitive touchpad, a battery, and more — fit into the smallest possible space and the lightest possible frame. The form factor drove a lot of decisions, from speaker architecture to the camera selection.[3]

17.     EssilorLuxottica designed the Glasses to be aesthetically identical to its other popular brands, and Meta stated that the new "Ray-Ban Stories are available in 20 variations, in some of the most iconic Ray-Ban styles — Wayfarer/Wayfarer Large, Round, and Meteor[.]"[4] The only difference between the Meta AI Glasses and Luxottica's other popular brands was that the Meta AI Glasses include additional camera and microphone features that enable users to capture images, videos, and audio recordings.[5]

18.     On October 17, 2023, Defendants released a second generation of the Glasses, and on June 20, 2025, Defendants released a third generation. The second and third generations of the Glasses included certain additional features, which built on the Glasses' core function to collect photos, videos, audio-recordings, and to provide the user with AI assistance.

19.     On September 27, 2023, Meta announced a new version of the Glasses, stating that "[t]oday at Meta Connect, in partnership with EssilorLuxottica, we announced our next-generation

---

[3] "Ray-Ban and Facebook introduce Ray-Ban Stories, first-generation smart glasses," Sept. 9, 2021, https://tech.facebook.com/reality-labs/2021/9/ray-ban-and-facebook-introduce-ray-ban-stories-first-generation-smart-glasses/.
[4] Id.
[5] Id.

CLASS ACTION COMPLAINT                                                                              4

Ray-Ban Meta smart glasses collection. We redesigned these from the ground up, improving all the core features of the first generation while adding new capabilities that have never been seen on a pair of smart glasses before." With this new edition, the Glasses "integrated Meta AI, [Meta's] advanced conversational assistant, on Ray-Ban Meta smart glasses and optimized it for a hands-free, on-the-go experience. By saying 'Hey Meta,' you can engage with Meta AI to spark creativity, get information, and control features — just by using your voice."[6]

20. On April 23, 2024, Meta announced that "[o]ur second-generation smart glasses, in partnership with EssilorLuxottica, have been flying off the shelves — they're selling out faster than we can make them. And just in time for sunglasses season, we're expanding the Ray-Ban Meta smart glasses collection with new styles designed to fit more face shapes so you can find the perfect pair. We're also adding new features, including updates to Meta AI, to make the glasses even more useful." This new version included a new AI update: "We started testing a multimodal AI update in December, so you can ask your glasses about what you're seeing, and they'll give you smart, helpful answers or suggestions. That means you can do more with your glasses because now they can see what you see."[7]

21. Currently, the Glasses come in a range of models, which all feature a camera to take videos and images, a microphone to capture audio, and an AI-based "assistant" to interact with the user in various ways. Among other things, the AI assistant provides responses to oral questions and prompts, translates languages, and sends messages and phone calls. The Glasses also enable wearers to direct the built-in assistant to take photos, videos, and livestream directly to Meta's social media platforms, Facebook and Instagram.

22. According to Meta, "[c]ertain features, like sharing from your glasses using your voice ('Hey Meta, send a photo'), may require sending your photos and videos to Meta's cloud for processing and temporary storage."[8]

---

[6] "Introducing the New Ray-Ban | Meta Smart Glasses," Sept. 27, 2023, https://about.fb.com/news/2023/09/new-ray-ban-meta-smart-glasses/.

[7] https://about.fb.com/news/2024/04/new-ray-ban-meta-smart-glasses-styles-and-meta-ai-updates/ (last accessed March 10, 2026).

[8] "Learn more about cloud media on AI glasses," https://www.meta.com/help/ai-glasses/734190441863923/ (last accessed March 11, 2026).

23. Once the Glasses are activated, wearers can connect the product through their Facebook account to the Meta View mobile app, which provides additional content editing, formatting, and sharing functions.

24. Meta's 2025 Form 10-K describes the Meta AI Glasses and their impact on Meta's business. Meta's "products enable people to connect and share through mobile devices, personal computers, virtual reality (VR) headsets, and AI glasses." *Id.* at 6. Meta's "wearables efforts include our AI glasses and long-term AR initiatives. Our current AI glasses include the Ray-Ban Meta and Oakley Meta glasses, which feature Meta AI, our advanced conversational assistant, as well as other features such as hands-free interaction. . . . In 2025, we introduced Meta Ray-Ban Display, which combines our AI glasses with an integrated display built into the lens." *Id.* at 7. Meta's "[Reality Labs] revenue is generated from the delivery of consumer hardware products, such as Meta Quest and AI glasses, and related software and content." *Id.* at 71. "[Reality Labs] revenue in 2025 increased $61 million, or 3%, compared to 2024. The increase was driven by an increase in sales of AI glasses, partially offset by a decrease in Meta Quest sales." *Id.* at 73.

25. Meta's Form 10-K also alludes to its ongoing partnership with Luxottica, stating "[f]or our [Reality Labs] products, our sales efforts utilize third-party sales channels such as retailers, resellers, and distribution partners, and our direct-to-consumer channel, Meta.com, and several Meta stores. These efforts are focused on driving consumer and enterprise sales and adoption of our Meta Quest portfolio of products and AI glasses." *Id.* at 8.

## II.    Defendants' Representations about Privacy and Data Security

26. Since the launch of the Meta AI Glasses in September 2021, Meta has represented that users had control over their private data, and that such data would not be used or shared without users' consent.

27. Indeed, in the announcement of the launch in September 2021, Meta stated that the Glasses would only "collect data that's needed to make your glasses work and function, like your battery status to alert you when your battery is low, your email address and password for your Facebook login to verify it's really you when you log into the [Meta] View app, and your WiFi connectivity. You can opt-in to share additional data — which includes things like the number of

CLASS ACTION COMPLAINT                                                                                6

images you captured or how long you spend taking videos — with Facebook for product development, improvement, and personalization. This setting can be changed at any time. . . . The use of Facebook Assistant for voice command-powered capture is totally optional. You can view and delete your voice transcripts, and you always have the option to turn off voice storage and/or Facebook Assistant in Settings. . . . [W]e don't use the content of your photos and videos for personalized ads. . . . Building privacy features and controls isn't enough on its own. We recognize that we need to proactively educate people on how to use Ray-Ban Stories smart glasses safely and responsibly, both for their own protection and that of others around them. . . . EssilorLuxottica shares this vision for wearables that will transform the way we connect and interact with other people and the world around us."[9]

28.     After the launch, Defendants continued to assure users and the public that the Glasses did not pose data security risks. For instance, on September 27, 2023, EssilorLuxottica issued a joint statement with Meta from EssilorLuxottica's website announcing the second generation of the Glasses at the annual "Meta Connect" conference. In the joint statement, Defendants said that "a commitment to privacy continues to be at the core of the product" and that they had made the "privacy LED light bigger and more noticeable."[10]

29.     Defendants promoted user privacy as a core feature of the Glasses, and did so pervasively across multiple advertising channels, with various such representations on Meta's website including the trademark of a Luxottica brand.

30.     For instance, Meta's website has a specific page dedicated to the privacy features of the Meta AI Glasses, which states that the Meta AI Glasses are "designed for privacy, controlled by you." The same page states: "You're in control of your data and content. Clear, easy device and app settings help you manage your information, giving you control over what content you choose to share with others, and when." It also states that the Glasses have "Privacy Settings that matter.

---

[9] "Ray-Ban and Facebook introduce Ray-Ban Stories, first-generation smart glasses," Sept. 9, 2021, https://tech.facebook.com/reality-labs/2021/9/ray-ban-and-facebook-introduce-ray-ban-stories-first-generation-smart-glasses/.
[10] *Ray-Ban and Meta launch the next generation of smart glasses*, Sept. 27, 2023 https://www.essilorluxottica.com/en/newsroom/press-releases/ray-ban-and-meta-launch-the-next-generation-of-smart-glasses/ (last accessed March 8, 2026).

CLASS ACTION COMPLAINT                                                                    7

Easy to access settings let you view and manage the information you share with Meta. Meta collects data needed to help ensure your glasses and app are reliable, secure, and operating normally. You can choose to share additional data to improve the experience."[11]

31.     Meta also represents that the Glasses are "built for your privacy and others' too," and that Meta takes "steps to protect people's privacy, like removing key identifiable information."[12]

32.     In addition to these representations regarding the data security of the Glasses made in public statements and on Meta's website, Defendants also assured users and the public that the Glasses would respect user and third-party privacy in the Glasses' terms and conditions.

33.     For instance, in the "Supplemental Meta Platforms Technology Privacy Policy," which governs the Glasses, Meta reassures consumers what it had promised when the Product was originally launched: that "Additional Data" would only be shared with the user's consent, and that "Meta will use Additional Data for these purposes [of improving Meta products] if you choose to share Additional Data with Meta during your initial setup, and you can change your choice at any time in Settings."[13]

34.     The privacy policy states that Meta users "can use the AI Glasses to take photos and video recordings with audio (together 'Media'). This Media is captured on your AI Glasses and sent to your App. We will collect your Media when you turn on cloud processing on your AI Glasses, interact with the Meta AI service on your AI Glasses, or upload your Media to certain services provided by Meta (i.e., Facebook or Instagram). You can change your choices about cloud processing of your Media at any time in Settings." This statement is misleading, because it implies that "media" is only collected when users affirmatively intend and elect to do so. Furthermore, this statement fails to disclose that such media will be collected at times that the user does not intend, or that it will be shared with third parties—both of which are material facts known only to Defendants.[14]

---

[11] https://www.meta.com/ai-glasses/privacy/ (last accessed Mar. 8, 2026).
[12] *Id.*
[13] https://www.meta.com/ca/legal/privacy-policy/ (last accessed March 8, 2026).
[14] *Id.*

CLASS ACTION COMPLAINT                                                                    8

35.     Further, in its "Supplemental Meta Platforms Technologies Terms of Service," Meta states that "we don't sell your personal data to advertisers, and we don't share information that directly identifies you (such as your name, email address or other contact information) with advertisers unless you give us specific permission."[15] Again, this statement is misleading insofar as it implies that Meta will not surreptitiously collect audiovisual recordings and transmit them to third parties.

36.     Although it is "[b]uried in Meta's AI terms of use," Meta states that it may "'review your interactions with AIs, including the content of your conversations with or messages to AIs, and this review can be automated or manual (human).'" [16] This statement, however, does not explain that audiovisual recordings will be made and transmitted to third parties. Furthermore, "given the kind of information data annotators are being asked to review, many users don't appear to be aware of that last piece of advice. Worst of all, owners of Meta's AI glasses simply don't have the option of making use of the AI features without agreeing to share data shared with Meta's remote servers. And once the data is sent, it's already often too late."[17]

37.     At no point in any public statement, press release, online advertisement, or any other context, did Meta or Luxottica disclose that the Meta AI Glasses collect audiovisual recordings, without users' knowledge, intent, or consent, to be disseminated for manual review for the purpose of developing Meta's AI model. Defendants have also never made any attempt to obtain users' consent before doing so.

### III.    Defendants' Privacy Violations Exposed

38.     Defendants' representations regarding user privacy and data security were false, and Defendants failed to disclose to customers the truth about how their personal data would be collected and transmitted to third parties.

---

[15] https://www.meta.com/ca/legal/supplemental-terms-of-service/ (last accessed Mar. 8, 2026).
[16] Victor Tangermann, "Meta Workers Say They're Seeing Disturbing Things Through Users' Smart Glasses," March 2, 2026, https://futurism.com/artificial-intelligence/meta-disturbing-smart-glasses.
[17] *Id.*

CLASS ACTION COMPLAINT                                                                        9

39.     On February 27, 2026, Swedish newspapers Svenska Dagbladet and Göteborgs-Posten released an investigative report (the "Report") based on whistleblower testimony revealing that contract workers at the company Sama review audiovisual recordings taken by the Meta AI Glasses. The subtitle of the Report summarizes: "Bank details, sex and naked people who seem unaware they are being recorded. Behind Meta's new smart glasses lies a hidden workforce, uneasy about peering into the most intimate parts of other people's lives."[18]

40.     From the headquarters of Sama in Nairobi, Kenya, thousands of so-called "data annotators" review user data from the Meta AI Glasses, including audiovisual recordings of highly private and even intimate conduct, including naked bodies, sexual activity, and private bodily functions such as users using the bathroom. For example, data annotators reported reviewing footage of the users' spouses changing in their own bedrooms after the Glasses had been placed on a bedside table. Data annotators also reported reviewing footage that revealed confidential information, including images of financial statements and personal text messages. Data annotators also stated that key identifiable information had not been removed from the recordings, as faces were not always blurred and specific sensitive information like credit card numbers were not always kept confidential.[19]

41.     These data annotators manually categorize the data with labels, which is then used to train AI models that Meta deploys in its products and advertising campaigns, benefitting Meta at the expense of users.[20]

42.     Data annotators reported reviewing content that was beyond what a typical user would have created, and included content of which users, or those around the users, would have been unaware based on the context that the Glasses were recording.  As one of these data annotators said to the press: "You think that if they knew about the extent of the data collection, no one would dare to use the glasses."[21]

---

[18] *She Came Out of the Bathroom Naked, Employee Says*, SVENSKA DAGBLADET, Feb. 27, 2026, https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything.

[19] *Id.*

[20] *Id.*

[21] *Id.*

CLASS ACTION COMPLAINT                                                                 10

43. As the Report states, "[a]t first glance, it appears that [users] have significant control over our data. [Meta's terms] states that voice recordings may only be saved and used for improvement or training of other Meta products if the user actively agrees. But for the AI assistant to function, voice, text, image and sometimes video must be processed and may be shared onwards. This data processing is done automatically and cannot be turned off. . . . It is not specified how much data may be analysed or for how long it may be stored. Nor is it specified who is given access to the data. . . . We asked Meta to elaborate on how sharing highly private material with subcontractors such as Sama in Kenya can be reconciled with its privacy policy. We posed the same questions to Sama. There was no response."[22]

44. Meta's further comments to the press subsequent to the Report indicate that Meta's practices are not disclosed in any terms and conditions and that consumers are unaware of them. A Meta spokesperson reportedly told BBC News: "'When people share content with Meta AI, like other companies we sometimes use contractors to review this data to improve people's experience with the glasses, as stated in our Privacy Policy. . . . This data is first filtered to protect people's privacy.'" The latter part of this statement—that data is filtered to protect people's privacy—appears to be untrue based on the facts alleged herein. Nevertheless and moreover, "[i]n response to a request from the BBC, Meta provided a link to its Supplemental Meta Platforms Terms of Service, but it did not identify which sections of those terms covered the review of content by human contractors."[23] Indeed, Defendants do not appear to have disclosed in any manner the specific and material fact that Meta AI Glasses would transmit audiovisual data to third parties for human review.

## IV. Plaintiff's Experience

45. In February 2023, Plaintiff Canady purchased a pair of Meta AI Glasses at a Sunglass Hut store, a wholly-owned subsidiary of Luxottica, in Brooklyn, New York, for a retail price of $299 plus tax.

---

[22] *Id.*

[23] Chris Vallance, Regulator contacts Meta over workers watching intimate AI glasses videos, BBC NEWS, March 4, 2026, available at https://www.bbc.com/news/articles/c0q33nvj0qpo (emphasis added).

46. Plaintiff intended to use the Glasses to take photographs without holding a camera at an upcoming wedding, and was also interested in Glasses' instant-translation function because he was planning a trip to a Spanish-speaking country without a fluency in the language.

47. The disclosures and advertisements that Plaintiff saw and relied on before and when he purchased the Meta AI Glasses were substantially similar to and contained comparable statements to those described above.

48. Plaintiff would not have purchased the Glasses had he known that his personal data, in the form of unintended audiovisual recordings of his use and environment, could and would be shared with third parties.

49. Shortly after purchasing the Glasses, Plaintiff downloaded the associated Meta Mobile app using his Facebook account. Since the purchase of the Glasses, Plaintiff used them in a manner consistent with their advertised purpose, until around August 2025, when he purchased a second pair because his first pair ceased functioning.

50. In August 2025, Plaintiff Canady purchased another pair of Meta AI Glasses from the Sunglass Hut website from his home in New Rochelle, New York for a retail price of $299 plus tax.

51. Plaintiff did not connect his second pair of the Glasses to the Mobile App. Since the purchase of his second pair of the Glasses, Plaintiff used them in a manner consistent with their advertised purpose.

52. At no point before, during, or after either of Plaintiff's purchase processes did Defendants disclose that the Meta AI Glasses could or would collect, store, and/or transmit Plaintiff's photographs, videos, and/or audio recordings to be reviewed by humans for the purpose of developing Meta's AI models.

53. When Plaintiff was made aware the facts alleged herein through news reporting on or around February 27, 2026, he was shocked and dismayed to learn that his personal content was subject to being transmitted and reviewed by third parties for the purpose of developing Meta's AI models.

54.     Had he known the truth regarding the Meta AI Glasses, he would not have felt safe to use them in personal settings as he had, which would have drastically reduced their effectiveness and value to him.

55.     Plaintiff purchased both pairs of the Glasses at a substantial premium relative to Luxottica's other products because of the aforementioned AI features. For instance, comparable non-AI glasses in the identical Wayfarer model currently retail for approximately $191 per pair at Luxottica's subsidiary, Sunglass Hut.[24]

56.     Plaintiff did not feel safe using the Glasses in personal settings as he had before he learned the truth. Because of this, the Product is not worth the premium that he paid for them, because it is identical in all ways except for the aforementioned functions to other popular products sold by Luxottica.

57.     Plaintiff would use his Glasses in the future, and would purchase another pair if needed, if he knew that his personal data was not being collected and transmitted to third parties without his knowledge.

## CLASS ACTION ALLEGATIONS

58.     Plaintiff brings this suit as a class action on behalf of himself and all others similarly situated pursuant to Fed. R. Civ. P. 23. This action may be properly maintained as a class action, as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Fed. R. Civ. P. 23.

59.     Plaintiff seeks to represent a class of all owners of Meta AI Glasses (the "Class"). Plaintiff also seeks to represent a subclass of all owners of Meta AI Glasses in New York (the "New York Subclass").

60.     At present, Plaintiff understands "Meta AI Glasses" to include at least the following products: Ray-Ban Meta Gen 1 (Skyler), Ray-Ban Meta Gen 1 (Headliner), Ray-Ban Meta Gen 2 (Wayfarer), Ray-Ban Meta Gen 2 (Skyler), Ray-Ban Meta Gen 2 (Headliner), Oakley Meta HSTN, Oakley Meta Vanguard, and Meta Ray-Ban Display (Wayfarer). Upon completion of discovery

---

[24]     https://www.ray-ban.com/usa/sunglasses/RB2140Foriginal%20wayfarer%20classic-black/8053672058611 (last accessed March 11, 2026).

CLASS ACTION COMPLAINT                                                                                      13

with respect to scope of the Classes, Plaintiff reserves the right to amend the class definition. Excluded from the Classes are Defendants, their parents, their subsidiaries and affiliates, and their directors and officers.

61. While the exact number of members cannot be determined, the Classes consists of, at a minimum, thousands of persons. Defendant Luxottica reported that it sold more than 7 million Meta AI Glasses in 2025 worldwide.[25] The members of the Classes are therefore so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.

62. There are common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members, including but not limited to:

    a.     Whether the Meta AI Glasses unlawfully collected and transmitted users' personal data;

    b.     whether Defendants misrepresented, concealed, omitted, and/or failed to adequately disclose that the Meta AI Glasses collected and transmitted audiovisual data to third parties;

    c.     whether Defendants' conduct violated the laws, or any of them, cited in the causes of action herein;

    d.     whether Defendants were unjustly enriched by their conduct as alleged herein;

    e.     whether Defendants' conduct damaged members of the Classes and, if so, the measure of those damages; and

    f.     whether all members of the Classes are entitled to seek equitable and/or injunctive relief from Defendants, and if so, the measure and form of such relief.

---

[25] https://www.essilorluxottica.com/en/newsroom/press-releases/q4-full-year-2025-results/ (last accessed March 11, 2026).

CLASS ACTION COMPLAINT         14

63. Plaintiff's claims are typical of the claims of class members because Plaintiff and all class members have been injured and damaged by Defendants' common course of conduct as alleged herein.

64. Plaintiff will fairly and adequately represent and protect the interests of the other class members for purposes of Federal Rule of Civil Procedure 23(a)(4). Plaintiff is committed to pursuing this action and has retained competent counsel experienced in litigation of this type, and class action litigation in particular. Plaintiff has no interests antagonistic to those of other class members.

65. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the respective Class members to seek redress for the wrongful conduct alleged. Plaintiff's counsel, highly experienced in class action litigation, foresees little difficulty in the management of this case a class action.

## CAUSES OF ACTION

## COUNT I

**Violation of the Wiretap Act**

**18 U.S.C. § 2511(1)(a)**

*On Behalf of the Class against Meta*

66. Plaintiff incorporates all foregoing factual allegations.

67. Defendants, by their conduct as alleged herein, violated the Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), which subjects to suit any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication" (18 U.S.C. § 2511(1)(a)); or who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" (18 U.S.C. § 2511(1)(c)); or who "intentionally uses, or endeavors

CLASS ACTION COMPLAINT                                                                 15

to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection" (18 U.S.C. § 2511(1)(d)).

68. Plaintiff and Class members were not aware of, and did not consent on an informed basis to, the interception of their personal data by the Meta AI Glasses.

69. As to the Class and/or New York Subclass, Defendants' conduct was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d), including but not limited to intrusion upon seclusion (*see* Restat. 2d of Torts, § 652D); conversion (*see* Restat. 2d of Torts, § 511); and/or eavesdropping (see N.Y. Penal Law § 250.45). Defendants desired to cause the consequences of their acts, or believed that those consequences were substantially certain to result therefrom.

70. Plaintiff and Class members are entitled to relief pursuant to 18 U.S.C. § 2520, including such preliminary and other equitable or declaratory relief as may be appropriate; any profits made by Defendants as a result of the violation; statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT II

**Violation of the California Invasion of Privacy Act**

**Cal. Penal Code § 630 et seq.**

*On Behalf of the Class against Meta and Luxottica*

71. Plaintiff incorporates all foregoing factual allegations.

72. By collecting and disclosing Plaintiff's and Class Members' personal data without their informed consent, Defendants violated the California Invasion of Privacy Act, Cal. Penal Code § 630 et seq., including Cal. Penal Code § 631(a), which makes liable anyone who "reads, or attempts to read, or to learn the contents" of a communication "without the consent of all parties to the communication . . . or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or

conspires with any person or persons to unlawfully do, or permit, or cause to be done" the foregoing.

73.     Plaintiff is entitled to bring this action and seek to recover damages in the amount of five thousand dollars ($5,000) per violation, pursuant to Cal. Penal Code § 637.2 (under which "it is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages").

74.     Plaintiff also seeks punitive damages pursuant to Cal. Civ. Code § 3294 because Defendants are guilty of malice, oppression, and/or fraud as defined therein.

### COUNT III

**Violation of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code § 17200**

*On Behalf of the Class against Meta and Luxottica*

75.     Plaintiff incorporates all foregoing factual allegations.

76.     Plaintiff asserts this cause of action against Defendants for unlawful, unfair, and fraudulent business practices; and unfair, deceptive, untrue and misleading advertising, as defined by the UCL.

77.     Defendants' conduct violates the UCL, as the acts and practices of Defendants constitute a common and continuing course of conduct by means of "unlawful" "unfair" and "fraudulent" business acts or practices within the meaning of the UCL. Defendants' conduct was unlawful and unfair even to the extent it was not fraudulent.

78.     Defendants' conduct was **fraudulent** within the meaning of the UCL insofar as Defendants misrepresented the privacy and data security features of the Glasses, and/or omitted and failed to disclose the fact, known only to Defendants, that the Glasses were used by Meta to collect and transmit personal audiovisual data from that was then reviewed by third parties.

79.     Defendants' conduct is **unlawful**, and thus amounts to unfair competition as set forth in the UCL, in that it violates, among other things, California Civil Code §§ 1572, 1709 and 1710; the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630 et seq.; the Wiretap

CLASS ACTION COMPLAINT                                                                            17

Act, 18 U.S.C. § 2511(1)(a); and constitutes intrusion upon seclusion, conversion, and/or eavesdropping.

80. Defendants' conduct is **unfair**, and thus amounts to unfair competition as set forth in the UCL, in that it is immoral, unethical, oppressive, unscrupulous and substantially injurious to customers without sufficient countervailing benefit; and because it contravenes legislative policy as set forth in, *inter alia*, the laws cited in the preceding paragraph.

81. As a direct and proximate cause of Defendants' violations of the UCL, Plaintiff and the Class suffered an injury in fact and have suffered harm. Defendants, on the other hand, have been unjustly enriched by their conduct and should be required to make restitution to Plaintiff and the Class pursuant to Business & Professions Code § 17203.

82. Significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law. Due to these differences in proof and certainty, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law for damages. Even if legal remedies may be available, Plaintiff seeks equitable remedies in the alternative to legal remedies which are as of yet uncertain.

83. A constructive trust should be imposed upon all wrongful or inequitable proceeds received by Defendants traceable to Plaintiff and members of the Class.

### COUNT IV

**Violation of the California Consumer Legal Remedies Act**

**Cal. Civ. Code §§ 1750, et seq.**

*On Behalf of the Class against Meta and Luxottica*

84. Plaintiff incorporates all foregoing factual allegations.

85. The California CLRA prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or that results in the sale . . . of services to any consumer," which include: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …." (§ 1770(a)(5)); and/or "Advertising goods or services with intent not to sell them as advertised" (§ 1770(a)(9)).

---

CLASS ACTION COMPLAINT 18

Case 3:23-cv-01892-HSC Document 117 Filed 03/13/26 Page 107 of 118

86. Defendants' conduct complained of herein violates Cal. Civ. Code § 1770(a)(5) and (a)(9) in that Defendants misrepresented the privacy and data security features of the Meta AI Glasses, and/or omitted facts known only to Defendants about how users' data would be collected and transmitted.

87. The representations and omissions set forth above are of material facts that a reasonable consumer would have considered important in deciding whether to purchase the Product from Meta and Luxottica. Plaintiff and Class Members justifiably relied upon Defendants' misrepresentations and omissions to their detriment.

88. Plaintiff and Class Members have been, and continue to be, injured as a direct and proximate result of Defendants' violations of Cal. Civ. Code § 1770, and are entitled to seek recovery, as well as to pursue costs and attorneys' fees under § 1780(e).

89. Under the requirements of Cal. Civ. Code 1782, Plaintiff will send a CLRA letter to Defendants. If Defendants fail to rectify these issues within the time period specified therein, Plaintiff will amend this Complaint, as permitted thereby, to assert claims for additional relief, including damages and punitive damages pursuant to Cal. Civ. Code § 3294.

## COUNT V

### Violation of the New York General Business Law §§ 349 & 350

N.Y. Gen. Bus. Law §§ 349 & 350

*On Behalf of the New York Subclass against Meta and Luxottica*

90. Plaintiff incorporates all foregoing factual allegations.

91. GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service[.]"

92. GBL § 350 further declares unlawful "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

93. As described above, while engaging in consumer-oriented trade or commerce within the State of New York during the period relevant hereto, Defendants (a) made misrepresentations regarding user privacy and the data security of the Meta AI Glasses, and/or (b) omitted and failed to disclose facts known only to Defendants, namely that users' personal data was subject to

CLASS ACTION COMPLAINT 19

collection and transmission to third parties for human analysis for the purpose of improving Meta's AI products.

94. The foregoing deceptive acts and practices were directed at consumers.

95. As a result of Defendants' false, misleading, and deceptive misrepresentations and omissions, Plaintiff and the members of the New York Subclass have suffered and continue injury.

96. On behalf of himself and other members of the New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or statutory damages, whichever is greater, three-times actual damages, and reasonable attorneys' fees.

## COUNT VI

### Unjust Enrichment

*On Behalf of the Class against Meta and Luxottica*

97. Plaintiff incorporates all foregoing factual allegations

98. Defendants received benefits from Plaintiffs and Class members and unjustly retained those benefits at their expense.

99. Plaintiffs and Class members conferred a benefit upon Meta in the form of valuable sensitive personal data that Meta collected from Plaintiff and Class Members without authorization and proper compensation. Meta has collected, disclosed, and otherwise misused this information for its own gain, providing Meta with economic, intangible, and other benefits, including substantial monetary compensation.

100. Plaintiff and Class members conferred a benefit upon Luxottica by purchasing the Glasses based on false premises, which they would not have done if they knew that purchasing the Glasses would lead to the collection and dissemination of their sensitive personal data. Luxottica's misrepresentations and omissions were to its own economic gain, and it received substantial funds from Plaintiff and Class Members as a result of its conduct.

101. The benefits that Defendants deprived from Plaintiff and Class Members rightly belong to Plaintiffs and Class members. It would be inequitable under unjust enrichment principles in California and every other state for Defendants to be permitted to retain any of the profit or other

CLASS ACTION COMPLAINT                                                                    20

benefits they derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

102.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, requests that the Court award the following relief, together or in the alternative:

a.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23;

b.    Appoint Plaintiff as representative of the Classes, and designate the undersigned as Class Counsel;

c.    Declare Defendants' conduct unlawful;

d.    Enjoin Defendants from continuing the unlawful conduct alleged herein;

e.    Award Plaintiff and the Class damages under common law and/or by statute, including punitive damages;

f.    Grant Plaintiff and the Class payment of the costs of prosecuting this action, including expert fees and expenses;

g.    Grant Plaintiff and the Class payment of reasonable attorneys' fees; and

h.    Grant such other equitable relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff and Class Members demand a trial by jury on all triable issues.

Dated: March 11, 2026                    Respectfully submitted,

*/s/ Philip M. Black*
Philip M. Black (SBN 308619)
Samuel Coffin (*pro hac vice* application to be filed)
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
Telephone: (212) 759-4600
Facsimile: (212) 486-2093

CLASS ACTION COMPLAINT                                              21

Email: pblack@wolfpopper.com
scoffin@wolfpopper.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| GINA BARTONE and MATEO CANU, individually and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br>   v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,<br><br>                Defendants. | Case No. 3:26-cv-01897-EMC<br><br>**[PROPOSED] ORDER GRANTING PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO RELATE CASES**<br><br>Judge:    Hon. Edward M. Chen |
| PETER TITTL, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br>   v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,<br><br>                Defendants. | Case No. 3:26-cv-01992-AGT<br><br>Judge:    Hon. Alex G. Tse |

[PROPOSED] ORDER GRANTING PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO RELATE CASES; No. 3:26-cv-01897-EMC

NICOLAS TEJADA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 4:26-cv-02015-HSG

Judge:  Hon. Haywood S. Gilliam, Jr.

ARSHAM KOSARI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 3:26-cv-02022-SK

Judge:  Hon. Sallie Kim

PETER CANADY, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 3:26-cv-02118-TSH

Judge:  Hon. Thomas S. Hixson

[PROPOSED] ORDER GRANTING PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO RELATE CASES; No. 3:26-cv-01897-EMC

This matter comes before the Court on Plaintiff Peter Tittl's ("Plaintiff Tittl") Administrative Motion to Consider Whether Cases Should Be Related pursuant to Civ. L. R. 3-12 and 7-11.

The Court, having considered Plaintiff Tittl's motion to relate *Bartone v. Meta Platforms, Inc. et al.*, No. 3:26-cv-01897-EMC ("*Bartone*"), *Tittl v. Meta Platforms, Inc. et al.*, 3:26-cv-01992-AGT ("*Tittl*"), *Tejada v. Meta Platforms, Inc. et al.*, 4:26-cv-02015-HSG ("*Tejada*"), *Kosari v. Meta Platforms, Inc. et al.*, 3:26-cv-02022-SK ("*Kosari*") and *Canady v. Meta Platforms, Inc. et al.*, 3:26-cv-02118-TSH ("*Canady*") and good cause appearing, HEREBY GRANTS the motion.

The *Bartone, Tittl, Tejada, Kosari* and *Canady* actions concern substantially the same parties, property, transactions or events, and it appears likely that there will be an unduly burdensome duplication of labor or expense or conflicting results if the cases are conducted before different judges. Therefore, the above matters are hereby related and reassigned to the undersigned judge.

**SO ORDERED**.

Dated: _____

_____
HON. EDWARD M. CHEN
UNITED STATES DISTRICT JUDGE

---

1

[PROPOSED] ORDER GRANTING PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION
TO RELATE CASES; No. 3:26-cv-01897-EMC

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Alyssa Brown (SBN 301313)
abrown@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile:  (310) 474-8585

*Counsel for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| GINA BARTONE and MATEO CANU, individually and on behalf of all others similarly situated,<br><br>               Plaintiffs,<br><br>     v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,<br><br>               Defendants. | Case No. 3:26-cv-01897-EMC<br><br>**PROOF OF SERVICE**<br><br>Judge:   Hon. Edward M. Chen |
| PETER TITTL, individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>     v.<br><br>META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,<br><br>               Defendants. | Case No. 3:26-cv-01992-AGT<br><br>Judge:     Hon. Alex G. Tse |

NICOLAS TEJADA, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 4:26-cv-02015-HSG

Judge:    Hon. Haywood S. Gilliam, Jr.

ARSHAM KOSARI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 3:26-cv-02022-SK

Judge:    Hon. Sallie Kim

PETER CANADY, individually and on behalf of all others similarly situated,

Plaintiff,

v.

META PLATFORMS, INC. and LUXOTTICA OF AMERICA, INC.,

Defendants.

Case No. 3:26-cv-02118-TSH

Judge:    Hon. Thomas S. Hixon

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Ahdoot & Wolfson, PC, 2600 West Olive Avenue, Suite 500, Burbank, California 91505. On the date set forth below, I served the within documents:

► **PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CAES SHOULD BE RELATED PURSUANT TO CIV. L. R. 3-12 AND 7-11**

► **DECLARATION OF TINA WOLFSON IN SUPPORT OF PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIV. L. R. 3-12 AND 7-11**

► **[PROPOSED] ORDER GRANTING PLAINTIFF PETER TITTL'S ADMINISTRATIVE MOTION TO RELATE CASES**

☒ **BY U.S. MAIL** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Diego, California addressed as set forth below. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

META PLATFORMS, INC.
c/o CSC - Lawyers Incorporating Service
ATTN: Koy Saechao
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 9583

LUXOTTICA OF AMERICA, INC.
c/o National Registered Agents Inc.
ATTN: Amanda Garcia
330 N. Brand Blvd.
Glendale CA 91203

SAMASOURCE
IMPACT SOURCING INC., d/b/a SAMA
c/o Wendy Gonzalez, Agent
2017 Mission Street, Suite 301
San Francisco CA 94110

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING** by causing such document(s) listed above to be served through this Court's electronic transmission facilities via the Notice of Electronic Filing (NEF) and hyperlink, to the parties and/or counsel who are determined this date to be registered CM/ECF Users set forth in the service list obtained from this Court on the Electronic Mail Notice List. I certify that all participants in this case are registered CM/ECF users.

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

PROOF OF SERVICE; No. 26-cv-01897-EMC

- **Jiaming Zheng**
  jzheng@clarksonlawfirm.com

- **Mark I. Richards**
  mrichards@clarksonlawfirm.com

- **Yana Hart**
  yhart@clarksonlawfirm.com

- **Ryan J. Clarkson**
  rclarkson@clarksonlawfirm.com

In addition, notices of filing will be filed and served via CM/ECF in the proposed related actions, to the following who are currently on the list to receive e-mail notices for those cases:

*Tittl v. Meta Platforms, Inc., et al.*, No. 3:26-cv-01992-AGT:

- **Robert Ahdoot**
  rahdoot@ahdootwolfson.com

- **Theodore Walter Maya**
  tmaya@ahdootwolfson.com

- **Tina Wolfson**
  twolfson@ahdootwolfson.com

*Tejada v. Meta Platforms, Inc., et al.*, No. 4:26-cv-02015-HSG:

- **William J. Edelman**
  wedelman@milberg.com

- **Heather Lopez**
  hlopez@milberg.com

*Kosari v. Meta Platforms, Inc., et al.*, No. 3:26-cv-02022-SK:

- **Kristen Cardoso**
  cardoso@kolawyers.com

*Canady v. Meta Platforms, Inc, et al.*, No. 3:26-cv-02118-TSH:

- **Philip Marcel Black**
  pblack@wolfpopper.com

☒ I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on March 12, 2025, at San Diego, California.

_____
Carlos D. Armijo

PROOF OF SERVICE; No. 26-cv-01897-EMC